PETER BROWN & ASSOCIATES PLLC
Peter Brown
260 Madison Avenue, 16th Floor
New York, New York 10016
Telephone:     212.939.6440
Facsimile:      646-607-2530
*Attorneys for Plaintiff*

LEE & LUM, LLP
Robert Lum
1185 Avenue of the Americas, 3rd Floor
New York, New York
Telephone:     212.634.7248
Facsimile:      212.634.7246
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X

RAYMOND BASRI,

                   Plaintiff,

     -against-

RICHARD GORDON and AIR99 LLC,

            Defendants.

------------------------------------------------------- X

INDEX NO.

**COMPLAINT**

Jury Trial Demanded

      Plaintiff Raymond Basri, MD, FACP ("Basri"), by his attorneys, Peter Brown & Associates

PLLC, and Lee & Lum, LLP, for his Complaint against defendants Richard Gordon ("Gordon")

and Air99 LLC (together, the "Defendants") alleges as follows:

**PRELIMINARY STATEMENT**

      1.     Plaintiff Basri was a life-long friend of Defendant Gordon, having first become

acquainted over forty years ago, when Basri was an undergraduate at Columbia University and lived

with Gordon's two brothers. This action arises out of reprehensible violations of that long personal

relationship by conduct which included fraud, breach of contract, unjust enrichment, theft of services and cash and misuse of intellectual property.

2.      Plaintiff is a highly experienced physician with unique experience in the field of internal medicine, respiratory protection, firefighting, and aviation medicine. After living in China, Gordon identified a potential market for a mass-market respiratory mask for daily use by adults and children. At a family party in or around June of 2015, Gordon approached Basri to form a general partnership in which they would both be partners with an idea to develop an advanced respiratory mask with superior protection at a modest cost (the "Venture").

3.      Furthermore, to further induce Basri to participate in the Venture by contributing his intellectual property, equipment, knowledge and experience, time, and substantial cash contributions, Gordon also represented and agreed that Basri would participate as a partner with equity interest in a company that will be created solely to exploit the Invention.

4.      Gordon and Basri worked together continuously to design and test several variations of the respiratory mask and filter materials. Throughout this process, Basri actively participated in the Venture by contributing capital and his expertise to develop the respiratory mask, and he was fully authorized to act on behalf of the Venture, including the authority to retain outside experts as independent contractors who assisted Basri with the design and testing of the respiratory mask.  After several years of concentrated effort, the Venture developed a unique respiratory mask using an origami-inspired construction and triple layered materials as filters for viruses, diesel fumes, and air pollution (the "Invention"). An application to patent the Invention was filed and ultimately granted.

5.      The Invention was a success, and it was publicly recognized as a superior and innovative design when it won a one hundred-thousand-dollar ($100,000) award in a federal government competition. Upon presentation of the award at a ceremony in Washington, DC, Gordon

notified Basri that he was not a founder, never a partner to the Venture and would have no interest in the company formed to exploit the patented respiratory mask, Air99 LLC, or the Invention. To date, Basri has been paid nothing for his many years of effort and substantial contributions to both the Invention and the Venture.

6.　　　Basri brings this action seeking monetary damages and his share in Air99 LLC as a result of Gordon's breach of contract; unjust enrichment; promissory estoppel; fraud; quantum meruit; and breach of fiduciary duty.

## JURISDICTION AND VENUE

7.　　　Plaintiff is a resident of New York County, New York. This Court has jurisdiction over this action under 28 U.S.C. § 1332. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.　　　This Court's personal jurisdiction over the Defendants is established for the reason that defendants, directly, or through their principal, formulated, negotiated and transacted business in New York State or through their tortious actions engaged in activities which they knew would cause injury to a resident of New York State, the events of which gave rise to the following causes of action.

9.　　　Venue is properly laid in this district under 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events giving rise to these causes of action occurred in this district, or were tortious acts intentionally causing injury in this district, the Defendants are subject to this court's personal jurisdiction.

## THE PARTIES

10.　　　Plaintiff, Raymond Basri, MD, is a physician and specialist in the fields of internal medicine, occupational medicine, and aviation medicine. Dr. Basri practices in New York City, Middletown, New York and Morristown, New Jersey. He has notable expertise in respiratory

protection arising from his work as an active volunteer firefighter for thirty-five (35) years at the Fire Department of the City of New York ("FDNY") and the World Trade Center monitoring program. He has also serves as a Clinical Assistant Professor of Medicine at the New York Medical College.

11.     Defendant Richard Gordon is a resident of the State of Colorado. His education and experience are as an engineer. Upon information and belief, prior to the formation of the Venture with Basri, Gordon had no experience relating to respiratory protection.

12.     Defendant Air99 LLC is a limited liability company which was formed on August 9, 2016, under the laws of Colorado. Upon information and belief, Gordon is the sole owner and member of this LLC.

13.     Gordon is using the Air99 entity to offer the Invention for sale on the Internet using the trademark Airgami. It maintains a website at [www.airgami.life](www.airgami.life).

## FACTUAL ALLEGATIONS

### The Formation of the Venture

14.     Basri initially met Gordon through his brother, Michael, in or around 1973, when he and Michael were freshman at Columbia College. Basri and both brothers Michael and Andrew Gordon were fraternity brothers throughout their college years. During the following decades, Basri was frequently invited to family events also attended by Gordon. In June 2015 Basri attended a birthday party for Gordon's brother Michael in Newport Beach California. At this party Gordon told Basri about his idea of developing a better mass-market respiratory mask, based on his recent experience of living in China.

15.     During their initial discussion, Gordon stated that he was aware of Basri's extensive professional experience in respiratory protection, internal medicine, and firefighting; therefore,

Gordon solicited Basri to contribute his skills and knowledge to design and develop a respiratory mask for profit. In exchange, Gordon invited Basri to form a partnership for said goals.

16.     They also discussed Gordon's work at Bell Labs, where patent of the inventions would be attributed to their team of inventors responsible for its research and development. For that reason, among other things, Basri informed him that it was important that he would be acknowledged for his invention of a respiratory mask. Further, in his other professional work, such as research for scientific journals, Basri and other participants would be listed as contributors to the research and development in the order of their contributions to the work.

17.     To induce Basri to become a partner Gordon made a number of substantially and presently false promises and statements during their initial conversation but without disclosing their falsities and his intention to not perform, including that (a) Gordon wanted Basri to be an equal partner and share equally in the future respiratory mask and the anticipated profits it would generate; (b) Gordon and Basri would share equally in the responsibilities and business decisions in exploiting any respiratory mask they developed and went into market; (c) Gordon had no financial resources to invest in the partnership and the development of the respiratory mask; and (d) Basri would be given full credit for his expertise and contributions to any respiratory mask which would be developed by the partnership.

18.     Basri and Gordon agreed to work together as founding partners to develop a superior and novel respiratory mask that would be profitable in the world-wide market.

19.     Gordon made false representation to Basri that he had no employment and no source of income. Gordon said that his wife just finished business school and went to work after the family recently moved back to Colorado from China. On that basis, Basri agreed to be the sole founding partner to make the initial capital contribution to the venture.

20.     As a result, Basri later incurred debt to pay for various expenses to fund the Venture and in developing the prototypes, such as to purchase materials for the filters and straps.

21.     Over the next four years, each of these representations and promises provided to be false. Gordon's undisclosed goal was to exploit Basri's considerable expertise to develop a respiratory mask which he, alone, would exploit for his financial benefit.

22.     The day following the birthday party in June 2015, Gordon introduced Mr. Sandro Klein ("Klein"), a resident of Irvine, California, who is an experienced industrial designer, who would contribute to the Venture by consulting on issues of the mask's design and packaging.

23.     In furtherance of the goals of the Venture, Basri performed extensive research on respiratory standards and accreditation of respiratory masks, paid out-of-pocket to retain an outside independent consultant, and contributed his staff and own equipment to help test each prototype.

24.     Based on his experience and expertise, Basri made early and fundamental contributions to the Invention. Basri investigated several types of filtering materials and ultimately recommended that a mask composed of a composite of three layers of material, each providing different characteristics to the final mask, while improving the mask's breathability, would offer a novel and effective solution to its construction. Basri's recommendation was incorporated into the ultimate design and functionality of the mask.

25.     Since the mask was planned to fit a variety of sizes and shapes of faces, Basri also contributed various key improvements to the working protypes to further the functionality of the mask which included: adjusting the folding pattern around the nose and chin to improve fit; and changing the position of the ear loops to increase tension and improve sealing characteristics.

26.     At various stages of the mask's development, Basri was responsible for testing procedures which were familiar to him because of his work as a respiratory specialist and his

experience as a medical professional who attended to firefighters mandated FIT testing to certify using Self-Contained Breathing Apparatus (SCBA). FIT testing is an OSHA accepted protocol for personal protective equipment, pursuant to OSHA Regulations §1910.14, App. A.

25.     As a general partner of the Venture, Basri was authorized by the Venture and consented to by Gordon to hire appropriate testing experts to conduct testing of various protypes. On behalf of the Venture, he negotiated and signed retainer and non-disclosure agreements with outside consulting experts. In all instances he paid the experts out of his own pocket since there was no business funding for the expenses of the Venture.

27.     Initially, the friends did not enter into a written general partnership arrangement and continued to operate the Venture informally based on their decades of personal good will toward each other.

28.     It was agreed by the partners from the formation of the Venture, that the goal was to patent the Invention, mass produce the patented respiratory face mask and to make it available for purchase worldwide, and the partners would share in the development of the Invention and in any ultimate profits and costs from its commercialization.

29.     After the Venture settled on a design of the Invention, Gordon attempted to add his wife, Min Xiao ("Xiao"), as a partner of the Venture with a significant equity interest therein, to which Basri made objections to, because based upon Basri's information and belief, Xiao had no role in the design or development of the Invention or in the advancement of the Venture while Basri was actively involved.

30.     In February 2016, Gordon requested that the Venture be set in a formal written agreement, so he sent an email to Basri and Klein which he addressed them as "founders," and the "founding team," with the subject line "Carving up the founder's pie," containing a website link to

literature and "methodology for cutting up the founder's pie in a new venture" and asked them to fill out a spreadsheet table document with their calculations on what they each believed to be a fair and equitable allocation of the equity interest in the Venture, which would include the profits and loss arising from the commercialization of the Invention.

31.     Gordon stated that the Venture had the option to reserve and set aside equity interest for prospective employees or, alternatively, to dividing "100% of the pie up front and then <u>all founders</u> subsequently should expect that their share will be diluted (this is OK if the pie keeps getting bigger)."

32.     Furthermore, Gordon stated that he intended to assign the rights of the Invention to Air99 LLC, a new company that he would form, which would be used to further commercialize the Invention, and the members, including Basri, would be allocated the profits and losses.

33.     Gordon insisted on adding his wife, Xiao, as a member of the Venture. Basri objected to a proposed allocation of significant equity interest to Xiao because she had not contributed openly to the Venture. The resulting allocation of over half of the total equity interest to Gordon and his wife was not commensurate to Gordon's contributions to the Venture. However, dissatisfied and upset with Basri's valuation of his contribution to the Venture, Gordon refused to engage in further discussions on the allocation of the partnership interest.

34.     After many months of working together as the partners of the Venture, they executed a document titled "Intention to Form a Company" on March 27, 2016 (the "IFC Agreement"), which was drafted by the Bryan Cave Leighton Paisner LLP law firm ("Bryan Cave").

35.     Upon information and belief, the Bryan Cave law firm drafted the IFC Agreement pursuant to Gordon's instructions. The IFC Agreement had a term of one year and it terminated if a company which included all the "Team Members" was not organized. The key provisions of the IFC

Agreement were (i) that Basri commenced service to the Company on June 1, 2015[1]; (ii) an assignment of all the Venture's intellectual property to a Company which would subsequently be formed; (iii) non-disclosure and non-compete provisions, (iv) the IFC Agreement shall be in effect until March 27, 2017, and (v) the provisions and rights under the IFC Agreement would transfer to the Company only upon its incorporation on or before March 27, 2017.

36.     Upon information and belief, the Bryan Cave firm prepared the IFC agreement about the time the patent application was being drafted. The Bryan Cave lawyers knew that the Venture was operating as a general partnership to develop the Invention but had not yet executed a formal written agreement.

37.     Based on Gordon's representations, this document was the first step in documenting the Venture's structure for the benefit of all the partners, including a "fair" allocation of equity interest among them, and therefore, Basri executed the IFC Agreement. This was a knowingly false representation by Gordon since he never intended for the equity interest to be fairly allocated.

38.     Basri received no consideration in return for signing the IFC Agreement.

<u>The Patenting of the Invention</u>

39.     In or around 2016, Basri agreed that the Venture would retain the Boulder, Colorado office of the Bryan Cave law firm to prepare and prosecute a patent application for the Invention, with his understanding based on Gordon's representation that Basri will be named as a co-Inventor to the patent. The application was prepared by a patent associate of Bryan Cave, Stephen Benyi. Further, Basri paid for the expenses out of pocket associated with the said patent application, including a substantial portion of the legal fees paid to Bryan Cave.

---

[1] The IFC Agreement contains a typo which stated the date was June 1, 2014.

40.    The patent application went through numerous iterations as Gordon and Basri assisted Benyi to define and clarify the novel features of the Invention.  Gordon served as the local contact with the law firm, but he shared numerous drafts with Basri.

41.    Basri and Gordon exchanged frequent emails and conducted many telephone calls and text messages to develop and perfect the patent application. Basri devoted a substantial amount of time over many months to the drafting and editing of the patent application and to his consultations with Gordon by advising on the novel features of the Invention by explaining the design and functionality thereof. Notably, Basri advised on the fit testing for the air space between the mask and skin around the nose and chin area, which was a key feature that Basri had initially recommended for the Invention. Ultimately, Basri's time and effort contributed to the success of the patent application filing.

42.    Upon information and belief, the patent application for the Invention was filed on February 27, 2017, as U.S. Patent Application 15/433,643 and listed Gordon as the sole inventor.

43.    After a patent application is filed, the processing includes a detailed review by a trained Patent Examiner, frequent edits, and critical Office Actions.

44.    Gordon ignored Basri's objections and demands to be named as a co-Inventor to the Invention despite fully understanding that Basri expended significant time and expenses and made unique contributions to the Invention throughout, and Gordon's misconduct was also a violation of the founding spirit of the Venture which was to give all participants credit for their respective contributions.

45.    In response, Gordon informed Basri after the patent was filed that he has already been listed as the sole inventor. In retrospect, it was a first overt act by Gordon to take full and sole credit for the Invention and to steal all of the future benefits for himself.

46.     On or around October 13, 2020, a patent was issued to Gordon as the sole inventor of the Invention even though Gordon was fully aware that Basri made substantial contributions to the invention. By his actions, Gordon committed a fraud on the U.S. Patent Office by failing to include Basri as a co-inventor.

Gordon's Breach of the Parties' Agreement

47.     On or around August of 2016, Air99 LLC was established in the State of Colorado to be operated as a sole proprietorship under Gordon's exclusive control ("Air99").

48.     By a letter dated July 9, 2017, Gordon wrote to Basri stating that, going forward he was a mere "advisor" to Air99. Gordon did not offer to fairly compensate Basri for the valuable time prior to the letter spent purportedly as an "advisor" and did not offer to reimburse the thousands of dollars of expenses Basri has incurred.

49.     As the nominal sole owner of Air99, Gordon authorized counsel to prepare an operating agreement and subscription agreement. The operating agreement gave all decision-making power to Gordon. The subscription agreement offered Basri meaningless and valueless "Class B Units" of Air99, which did not represent a fair equitable interest in the rights to the company and/or patent commensurate to the time and money he expended for the development and patenting of the Invention these "Class B Units" did not grant Basri any management or voting rights. Basri rejected this "offer" out of hand.

50.     Basri's central demand was to receive a reasonable ownership interest in Air99 in proportion to his valuable contributions to the general partnership. Basri made repeated efforts to negotiate with Gordon to reach a fair allocation of the ownership in Air99 so that they could work together to commercialize its economic potential. All of his efforts fell on deaf ears and went nowhere.

51.     Upon information and belief, from the outset, it was Gordon's secret plan and scheme to never honor the terms and intent of the general partnership he created with Basri. Gordon's only goal was to manipulate his friend's good will, extract all of this unique knowledge and creativity, burden him with many of the Venture's expenses, and give Basri nothing in return.

The BARDA Award and the Final Breakup

52.     After the patent application was filed for the Invention and its design was protected, the Invention was ready for commercialization, including seeking investors to supply additional operating capital.

53.     In the spring of 2019, the federal government's Biomedical Advanced Research and Development Authority ("BARDA") conducted its Mask Innovation Challenge seeking new designs for face masks, to which Air99 was one of over one thousand entrants that submitted their inventions for consideration.

54.     Basri worked with Gordon to prepare the necessary written submissions describing the Invention. Basri actively participated in the oral presentation to the board conducting evaluations of competing designs. His highly effective closing to the oral presentation based upon his stated credentials as a physician and a firefighter were key factors in the successful presentation of the invention.

55.     The Invention was selected as one of the ten finalists in BARDA's competition. It was awarded the top prize of one hundred thousand dollars ($100,000) and hundreds of thousands of dollars in supportive assistance to pursue the commercialization of the Invention and the potential to mass produce hundreds of millions of masks for the federal strategic stockpile less than six months before the Covid-19 pandemic.

56.     After being notified that the Invention was selected for an award, on August 27, 2019, Gordon wrote an email to Basri and the others involved in the Venture stating:

> "*What I think is so great about our team, besides the obvious fact that everyone is brilliant in their own right, is that we have so little overlap in skills, that our collective skill-set is do [sic](so) broad and deep, and that we are all comfortable leveraging each other's strengths and accommodating our weakness. For me, this is the best team ever and I am super proud of our collaboration.*"

57.     An award ceremony for the competition winners was scheduled by BARDA for October 15, 2019, in Washington D.C. The award ceremony was the highpoint and culmination of Basri's and Gordon's joint efforts on the Invention.

58.     Initially, Basri purchased travel tickets and a hotel room in Washington at his own expense and informed the rest of the team of those details. Gordon attempted to discourage Basri from attending the ceremony, but he was not deterred. Basri was thrilled by the opportunity to receive scientific recognition for the innovative mask design that had become his personal passion.

59.     When he arrived at the ceremony, Basri found Gordon to be distant and acting oddly. Basri and Gordon met for two hours during which time Basri begged to be allowed on stage. Basri also called Michael Gordon in Newport Beach California to intervene on his behalf with his brother. However, Gordon refused to have Basri join him on stage when the award was presented.

60.     Immediately after the ceremony, Gordon announced to Basri that he was "firing" Basri from their Venture and the general partnership. Basri was devastated by the cruelty and treachery of Gordon's statement after years of collaborative efforts.

61.     On October 20, 2019, Gordon sent Basri an email confirming this alleged termination.

62.     This singular act of betrayal was followed by correspondence from Gordon, dated October 4, 2019, but was actually sent after October 20, 2019, which effectively tried to backdate the

alleged firing to a date before the BARDA award ceremony. Gordon asserted in his letter that Basri was a merely an advisor to Air99 and not a general partner.

63.     Along with his letter, Gordon sent at proposed Separation Agreement which again repeated that Basri was a mere advisor and "independent" contractor. The Separation Agreement offered Basri a nominal payment for his years of devoted work and creative contributions to the Invention.  It also offered to pay for a fraction of the out-of-pocket expenses, including legal fees paid to the Bryan Cave law firm, during Basri's participation as a general partner.

64.     The most significant term of the proposed Separation Agreement was a General Release of all claims Basri had against Air99, and its "… current and former officers, directors, shareholders, employees, attorneys and accountants and agents…" Basri rejected the proposed Separation Agreement as an insulting and demeaning attempt to re-write the history of the Invention and to deprive him of the benefit of years of contributions to the successful Invention.

65.     Thereafter, all business and personal ties and communication between Basri and Gordon were terminated. After four years of contributions to the Venture, which was the foundation for the Invention and Air99, Gordon did not have the decency to thank his former friend, Basri, for his significant contributions to the Venture.

66.     A notice of Basri's claims against Gordon and Air99 was sent by letter from Basri's law firm, Peter Brown & Associates PLLC to Gordon's lawyer at Bryan Cave on July 29, 2020. The letter proposed the parties negotiate an amicable resolution of Basri's claims. This offer was rejected by Gordon.

67.     By reason of the foregoing, Basri has been deprived of his rightful benefits from the Invention, and his share of Air99 which is the current assignee of the Invention. He has also suffered

monetary damages which will be determined at trial, but which are currently estimated as at least one million dollars ($1,000,000).

## FIRST CLAIM FOR RELIEF
### (BREACH OF GENERAL PARTNERSHIP)

68.     Basri repeats and realleges the allegations contained in paragraphs 1 through 67 of this Complaint as if set forth at length herein.

69.     The general partnership was formed by oral agreement between the founding partners, Gordon and Basri in 2014. The purpose of the general partnership was to develop an innovative design for a mass market respiratory face mask, and Gordon and Basri would be named as the co-inventors of the Invention.

70.     The partners agreed to work together to create a mask, patent the design and then engage in the commercial exploitation of the mask. The partners did not formalize their relationship with a written document because of their long-term friendship.

71.     From the formation of the Venture, it was agreed by Gordon and Basri that Basri's interest in the general partnership would be no less than 50% but later, to his surprise, Gordon offered far less in his proposed draft partnership agreement.

72.     Klein was later included as partner in the Venture.

73.     At all relevant times, Basri and Gordon actively participated and acted on behalf of the general partnership. Basri had the authority to act as a general partner of the Venture including the hiring of expert consultants, entering into contracts on behalf of the partnership, and negotiating with potential investors on behalf of the partnership. However, over time Gordon restricted business information to Basri and sought to circumscribe his role within the Venture.

74.      Basri also paid for numerous expenses of the general partnership, including expert consulting fees, bills for equipment and materials and the patent prosecution legal fees of Bryan Cave which were billed to Air99.

75.      Contrary to the intent and purpose of the general partnership, Gordon formed Air99 as a limited liability company in which he was the sole member.

76.      To the extent that Air99 acted on behalf of the Venture, it replaced Gordon (its sole shareholder) as a partner in the general partnership.

77.      Gordon and/or Air99 breached the general partnership by refusing to name Basri as a co-inventor to the Invention and assigning the Invention to Air99 while refusing to give Basri an interest in Air99 equivalent to his share of the general partnership.

78.      Gordon and/or Air99 breached the general partnership by failing and refusing to compensate Basri for the value of his time, effort, and creative contributions to the Venture.

79.      Gordon and/or Air99 breached the general partnership by failing and refusing to reimburse Basri for the expenses he incurred for the sole benefit of the general partnership.

80.      As a result of the foregoing, Basri has suffered damages to be determined at trial but which he believes to be not less than one million dollars ($1,000,000). In addition, Basri has been deprived of his fair and equitable interest in Air99, the entity which is the current owner of the Invention and its patent.

**SECOND CLAIM FOR RELIEF**
**(PROMISSORY ESTOPPEL)**

81.      Basri repeats and realleges the allegations contained in paragraphs 1 through 80 of this Complaint as if set forth at length herein.

82.     As part of his plan to create an improved respiratory face mask, Gordon required the experience and skill of an expert in respiratory issues, including protection from toxins, pollution, and disease. Basri had the unique expertise which Gordon desired.

83.     In order to induce him to participate in developing the proposed mask, Gordon promised Basri that he would be a partner in the Venture and that he would have a substantial share of the equity in any future business, including sharing in the Venture's future profits or royalties, and losses.

84.     Gordon knew that Basri would rely on these statements based on their decades-long friendship and these promises would induce Basri's enthusiastic participation and contributions to the Venture.

85.     Basri reasonably believed Gordon's statements and devoted approximately four years to the Venture and incurred debt to pay for many of the Venture's expenses.

86.     It would be inequitable and unjust for Gordon to retain Basri's valuable contributions without giving Basri the promised participation in the Venture and fair compensation for his time and payment of expenses.

87.     As a result of the foregoing, Basri has suffered damages in an amount to be determined at trial but which he believes to be not less than one million dollars ($1,000,000).

### THIRD CLAIM FOR RELIEF
### (FRAUD)

88.     Basri repeats and realleges the allegations contained in paragraphs 1 through 87 of this Complaint as if set forth at length herein.

89.     From on or around June 1, 2015 to October 15, 2019, Gordon repeatedly made materially false statements to Basri regarding his participation and ownership interest in the Venture. These false statements related to the fundamental structure of the Venture, the ownership of the

Invention's patent and allocation of the valuable benefits resulting from the commercialization of the Invention.

90.     Specifically, in June 2015 Gordon stated that (a) Gordon wanted Basri to be an equal partner and share equally in the future respiratory mask and the anticipated profits it would generate; (b) Gordon and Basri would share equally in the responsibilities and business decisions in exploiting any respiratory mask they developed; (c) Gordon offered no financial resources to invest in the partnership and the development of the respiratory mask; and (d) Basri would be given full credit for his expertise and contributions to any respiratory mask which would be developed by partnership.

91.     Gordon knew that his statements were false at the time they were made to Basri and that they were intended solely to induce Basri to participate and contribute to the Invention and the Venture.

92.     From at least March 27, 2016, Gordon stated he intended to form a business entity in which Basri had an ownership interest. Based on this representation, Basri was induced to sign a document prepared by the Bryan Cave law firm titled "Intention To Form A Company." In that document Basri was referred to as "Team Member" which Basri reasonably believed meant he was a partner in the Venture.

93.     As a result of this false and misleading IFC agreement, Basri was induced to assign all of his intellectual property, patent rights, copyrights, trade secrets and know-how to the Venture. Ultimately, Gordon claimed that the mask to be his sole invention in the Patent Application for the Invention dated February 27, 2017. This claim of being the sole inventor was false and in direct violation of the Patent Law. In addition, Basri was deprived of the benefit of his many contributions to the Invention and the Venture.

94.     The IFC agreement induced Basri to maintain the confidentiality of Invention's proprietary rights and intellectual property.

95.     In addition, Basri promised to not compete with the Venture or to engage in any activity which might assist any third-party from competing, or preparing to compete, with the Venture.

96.     In February 2016 Gordon solicited the participation of Basri and Klein in a process designed to allocate the interest of the Venture's partners in a planned company which would commercialize the Invention after a patent was issued.

97.     Following this procedure Gordon insisted that he and his wife Min Xiao be allocated a 50% interest and the balance was split between the other two partners, 30% to Basri and 20% to Klein.

98.     Gordon disregarded Basri's objections to the disproportionate and inequitable allocations and instead formed Air99 LLC in or around August 2016 in which he was the sole owner and member.

99.     Basri soon recognized that that the solicitation of his estimation of the value of his personal contribution was a sham intended to induce his continued participation in the Venture.

100.    Subsequently, Basri repeatedly negotiated with Gordon to receive less the initially allocated 50% interest in the Venture but not less than 30%. He also tried to secure Gordon's agreement to allocate some other amount and offered to pay additional money.

101.    Upon information and belief, Basri's good faith efforts with Gordon were rejected because Gordon never intended to give Basri an interest in Air99 in proportion to his years of contributions to the Venture or name Basri as the co-inventor to the Invention.

102. In 2019, Gordon induced Basri to participate in the drafting of documents to support the submission of the Invention in the BARDA Mask Innovation Challenge by claiming that if the Invention won the $100,000 award from the competition, then he would use the proceeds to commercialize the Invention for the benefit of the Venture.

103. He also stated that he would want Basri to share and participate in any award ceremony relating to the winning award. Specifically, Gordon and Basri discussed what they would say for the acceptance speech, that each would give a portion of their speech in Spanish, and that Basri would wear his dress FDNY uniform at the ceremony.

104. As a direct result of Gordon's statements, Basri was induced to draft and edit written submissions to BARDA. He also actively participated in an oral presentation to the award's judges.

105. Gordon's statements were false. Basri was deprived of any benefit from any the BARDA $100,000 award and Gordon never allocated an equitable share in the ownership of Air99 to Basri.  Basri was also humiliated and shunned by Gordon when he accepted the BARDA award, but explicitly directed that Basri could not participate in the award presentation ceremony.

106. As a result of the foregoing, Basri has suffered damages to be determined at trial but which he believes to be not less than one million dollars ($1,000,000).

**FOURTH CLAIM FOR RELIEF**
**(UNJUST ENRICHMANT)**

107. Basri repeats and realleges the allegations contained in paragraphs 1 through 106 of this Complaint as if set forth at length herein.

108. Defendants benefited from the fruits of Basri's labor, who contributed a significant amount of time and effort into developing the Invention, which he helped to obtain the patent application approval, helped win the BARDA award and the $100,000 prize money.

109. Gordon relied on Basri's knowledge and expertise, which proved to be invaluable by providing necessary information for the approval for the patent application for the Invention.

110. Basri provided his knowledge and expertise resources with the understanding that he would share in any of the benefits of the patented Invention and commercialization thereof, but Gordon has have failed to share those benefits with him and has retained the rights to the patent and royalty payments for himself, and depriving Basri of his fair share in Air99.

111. Throughout the period of developing and testing various design elements and materials for construction of the Invention, Basri devoted many hours away from his busy medical practice to contribute to the Venture. Pursuant to his professional experience and sterling reputation in the medical field, Basri is able to charge premium rates for his medical services. Yet, his nights, weekends, and days off were repeatedly devoted to advising Gordon on a multitude of issues related to starting up a complicated business venture and testing and perfecting the Invention. He consulted with Gordon by telephone, text daily and often multiple times per day and in person with Gordon occasionally. These contacts were often three to five times per week, for hours at a time. They also met in person when Gordon traveled to New York.

112. Neither Gordon nor Air99 has paid Basri for the value of the time he devoted to the Venture.

113. Gordon and Air99 knew that Basri had a right to ownership of the Invention and a fair partnership interest in Air99, but they precluded Basri from receiving his entitlements therein.

114. Gordon's conduct with respect to obtaining ownership in the Invention is improper and equity does not favor allowing him to escape restitution.

115. Gordon and Air99's conduct with respect to precluding Basri's fair partnership in the Invention is improper and equity does not favor allowing them to escape restitution.

116.    As a result of the foregoing, Basri has suffered damages to be determined at trial but which he believes to be not less than one million dollars ($1,000,000).

### FIFTH CLAIM FOR RELIEF
### (QUANTUM MERUIT)

117.    Basri repeats and realleges the allegations contained in paragraphs 1 through 116 of this Complaint as if set forth at length herein.

118.    Basri provided his services for Gordon and Air99 in good faith by contributing his knowledge and expertise and a significant amount of time and effort into developing the Invention.

119.    Basri contributed his nights, weekends, and days off repeatedly and devoted to perfecting and testing the Invention, whereby he also consulted with Gordon by telephone and in person with Gordon frequently, often three to five times per week, for hours at a time.

120.    Basri also contributed his knowledge and expertise to promote and market the Invention for the BARDA award competition, and which the Invention won said award, and Defendants retained the $100,000 prize money therefrom and precluding Basri from his entitlement to a fair share of the prize money.

121.    As a result of the foregoing, Basri has suffered damages to be determined at trial but which he believes to be not less than one million dollars ($1,000,000).

### SIXTH CLAIM FOR RELIEF
### (BREACH OF FIDUCIARY DUTY)

122.    Basri repeats and realleges the allegations contained in paragraphs 1 through 121 of this Complaint as if set forth at length herein.

123.    As a general partner in the Venture and as the sole owner of Air99, Gordon was in a position of trust and confidence and owed a duty of loyalty to Basri and the Venture and refrain from acts of self-dealing.

124.   To the extent that Air99 acted on behalf of the Venture and replaced Gordon (its sole shareholder) as a partner in the general partnership, Air99 also had a duty of loyalty to Basri to act in the best interest of the Venture and refrain from acts of self-dealing.

125.   Gordon and Air99 were required to act fairly and owed Basri a duty of good faith and fair dealing.

126.   At all times mentioned herein, Gordon and/or Air99 exercised complete control over the Venture, used their position to control the information relating to the development of the Invention, the drafting of the patent application, the relationship with the Ventures' counsel, and diverted the $100,000 in funds received from the BARDA competition and all the finances of the general partnership and/or Air99.

127.   Gordon and/or Air99 breached their fiduciary duties by engaging is a premediated plan of self-dealing i.e., to retain all the benefits and profits of the Invention and precluding Basri therefrom.

128.   To the extent the Invention offered a unique opportunity during a period of international health and safety awareness, Gordon and/or Air99 usurped and then wasted the entire business opportunity for his sole benefit.

129.   After "firing" Basri, Gordon proved himself to be an inept entrepreneur during the Covid-19 pandemic by failing to adequately fund, commercialize and distribute the Invention. Gordon's paranoid greed and selfishness caused him to waste a once-in-a- century opportunity.

130.   To the extent Basri shared his creative skills, know-how and decades of medical knowledge for the benefit of the Venture, Gordon and/or Air99 misappropriated this information for his sole benefit.

131.    As a direct result of Gordon's and/or Air99's breaches of fiduciary duties, Basri was damaged.

132.    As a result of the foregoing, Basri has suffered damages to be determined at trial but which he believes to be not less than one million dollars ($1,000,000).

### SEVENTH CLAIM FOR RELIEF
### (ACCOUNTING)

133.    Basri repeats and realleges the allegations contained in paragraphs 1 through 132 of this Complaint as if set forth at length herein.

134.    As set forth in detail above, Basri and Gordon entered into a general partnership in which both has an interest.

135.    Gordon controlled and withheld certain finances of the general partnership and Air99 from Basri.

136.    After the award of the $100,000 award for the BARDA competition on October 15, 2019, Gordon failed and refused to account for the use of the funds.

137.    Since 2019 has been exploiting the Invention for commercial purposes, including offering the respiratory mask for sale on a website. Gordon has failed and refused to account for the use of funds and any profits earned from the Invention.

138.    The amounts due to Basri are unknown and cannot be ascertained without an accounting by Gordon and Air99.

139.    For all the foregoing reasons, Gordon should be ordered to allow Basri, or his representative, to conduct an accounting of the general partnership and Air99.

**WHEREFORE**, Basri demands judgment against Gordon, as follows:

(i)      On the First Claim for Relief,  damages in the amount of not less than one million dollars ($1,000,000) and a thirty percent (30%) interest in Air99 LLC;

(ii)      On the Second Claim for Relief, an amount to be determined at trial;

(iii)      On the Third Claim for Relief, an amount to be determined at trial;

(iv)      On the Fourth Claim for Relief, an amount to be determined at trial;

(v)      On the Fifth Claim for Relief, an amount to be determined at trial;

(vi)      On the Sixth Claim for Relief, an amount to be determined at trial;

(vii)      On the Seventh Claim for Relief, the Court should order an accounting of the books and records in Gordon's possession and control relating to the Invention and any income or profits earned as a result of its commercial exploitation.

together with costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
       February 10, 2023

Respectfully submitted,

PETER BROWN & ASSOCIATES LLP

*/s/Peter Brown*
Peter Brown
pbrown@browntechlegal.com
260 Madison Avenue, 16th Floor
New York, New York  10016
Telephone:  212.939.6440
Facsimile:   646.607.2530
*Attorneys for Plaintiff*

LEE & LUM, LLP

*/s/Robert Lum*
Robert Lum
rlum@leelumlaw.com
1185 Avenue of the Americas 3rd Floor
New York, New York 10036
Telephone:  212.634.7248
Facsimile:   212.634.7246
*Attorneys for Plaintiff*