**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RAYMOND BASRI,

           *Plaintiff,*

    v.

RICHARD GORDON and AIR99 LLC,

           *Defendants.*

Case No. 23 Civ. 1170 (JGLC)

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PETER BROWN & ASSOCIATES PLLC
260 Madison Avenue, 16th Floor
New York, New York 10016
Telephone:    212.939.6440
Facsimile:    646-607-2530
*Attorneys for Plaintiff*

LEE & LUM, LLP
1185 Avenue of the Americas, 3rd Floor
New York, New York
Telephone:    212.634.7248
Facsimile:    212.634.7246
*Attorneys for Plaintiff*

i

# TABLE OF CONTENTS

PRELIMINARY STATEMENT                                                                  1

STATEMENT OF FACTS                                                                     2

    a. Formation of the Partnership                                                  2

    b. Agreement Between the Parties                                                 2

    c. Development of the Mask                                                       4

    d. Attempt to Formalize the Business                                             5

    e. Patent for the Mask                                                           6

    f. Investment and Fundraising Efforts                                            6

    g. Gordon's Unseemly Termination of Dr. Basri                                    8

ARGUMENT                                                                              8

    I.    Legal Standard                                                        8

    II.   Dr. Basri and Gordon Mutually Intended to Form a Partnership          9

    III.  Dr. Basri and Gordon Mutually Intended to Continue their Partnership   12

        A.   The Partnership Was Not Supplanted by the IFC Agreement and the Formation of Air99                                                       12

        B.   The Parties' Negotiation Demonstrate a Mutual Understanding of Continuing their Partnership                                              14

        C.   Gordon Recognized Dr. Basri's Contributions Consistent With A Partnership   16

    IV.  Dr. Basri Is Entitled to An Equitable Share Even If The Partnership Was Terminated   17

    V.   Summary Judgment Must Be Denied Because Defendants' Actions to Exclude Dr. Basri Create Genuine Issues of Material Fact                          18

    VI.  Gordon Is Estopped from Denying the Existence of a Partnership        18

    VII. Dr. Basri Has Adequately Plead the Allegations of Fraud               20

    VIII.Summary Judgment Must Be Denied as to the Claims For Unjust Enrichment and Quantum Meruit                                                       22

    IX.  Breach of Fiduciary Duty and Accounting                              24

CONCLUSION                                                                            25

## TABLE OF AUTHORITIES

### CASES

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 995 (2d Cir. 1983) ------------------ 25

*Cohen v. Biernoff*, 444 N.Y.S.2d 152, 153 (2d Dep't 1981) --------------------------------------- 9

*Dwyer v. Nicholson*, 193 A.D.2d 70, 72-73 (2d Dep't 1993) ------------------------------------- 17

*Evans v. Perl,* 2009 N.Y. Misc. LEXIS 5920 (2009) ------------------------------------------------- 25

*Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) ----------------------------- 24

*Gottlieb v. Northriver Trading Co. LLC*, 872 N.Y.S.2d 46 (1st Dep't 2009) ------------------------- 25

*Gramercy Equities v. Dumont*, 72 N.Y.2d 560, 565 (1988) ----------------------------------------- 9

*Growblox Scis., Inc. v. GCM Admin. Servs., LLC*, No. 14-CV-2280 ER, 2015 WL 3504208, at *8
    (S.D.N.Y. June 2, 2015) ------------------------------------------------------------------------ 13

*Hilton Wiener LLC v. Zenk*, 211 N.Y.S.3d 36, 37 (1st Dep't 2024) ---------------------------------- 24

*In re Fairfield Sentry Ltd.*, 627 B.R. 546, 564 (Bankr. S.D.N.Y. 2021) ----------------------------- 18

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey*, 194 B.R. 728,
    731 (S.D.N.Y. 1995) ---------------------------------------------------------------------------- 20

*Itel Containers Int'l Corp. v. Atlanttrafik Express Service, Ltd.*, 909 F.2d 698, 701 (2d Cir.1990) 9

*Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) ---------------------------------------- 9

*Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) ------------------------------------------------- 8

*Kaur v. Royal Arcadia Palace, Inc.*, 643 F. Supp. 2d 276, 296 (E.D.N.Y. 2007) -------------------- 15

*Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 172 (S.D.N.Y. 2004) ----------- 14

*Labajo v. Best Buy Stores, L.P.,* 478 F.Supp.2d 523, 531 (S.D.N.Y. 2007) -------------------------- 22

*Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F. Supp. 1220, 1231 (S.D.N.Y.
    1991) ------------------------------------------------------------------------------------------ 24

*Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) ---------------------------- 8

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) ------------------------------- 22

*Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168 (1st Dep't 1987) -------------------------- 24

*McClellan v. Smith*, 439 F.3d 137 (2d Cir. 2006) ----------------------------------------------------- 18

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007) ----------- 20

*Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537 (2d Cir. 1994)----------------------------- 25

*Moors v. Hall*, 143 A.D.2d 336, 338, 532 N.Y.S.2d 412, 414 (1988) ---------------------------------- 23

*Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 663 (2d Cir.1996)------- 23

*North Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*, 99 Civ. 4643, 2000 WL 1290608,
    *1, 2000 U.S. Dist. LEXIS 13139, at *3 (S.D.N.Y Sept. 11, 2000) --------------------------------- 9

*Northwestern Nat. Ins. Co. v. Alberts*, 769 F. Supp. 498, 506 (S.D.N.Y. 1991)---------------------- 25

*Palazzo v. Palazzo*, 503 N.Y.S.2d 381 (2d Dep't 1986) --------------------------------------------- 25

*Phillips v. Reed Group, Ltd.,* 955 F. Supp. 2d 201, 242–243 (S.D.N.Y. 2013)--------------------- 22

*Prince v. O'Brien*, 234 A.D.2d 12, 12 (1st Dep't 1996) ------------------------------------------- 9

*Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000) ------------------------------------ 23

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,* 309 A.D.2d 288, 300 (1st Dep't 2003) ------ 13

*Sagamore Corp. v. Diamond W. Energy Corp.*, 806 F.2d 373, 379 (2d Cir. 1986) ---------------- 12

*Sagus Marine Corp. v. Donald G. Rynne & Co.*, 207 A.D.2d 701, 702 (1st Dep't 1994)---------- 18

*Scholastic, Inc. v. Harris*, 259 F.3d 73, 84 (2d Cir. 2001)------------------------------------------- 11

*Scholastic, Inc. v. Harris*, 259 F.3d 73, 84 (2d Cir.2001) ----------------------------------------- 9

*Scholastic, Inc. v. Harris*, 259 F.3d 73, 87 (2d Cir. 2001)------------------------------------------ 18

*Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 768 F.Supp. 89, 96 (S.D.N.Y.1991)------------------ 23

*Shann v. Dunk,* 84 F.3d 73, 78 (2d Cir. 1996) --------------------------------------------------------- 10

*Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) --------------------------------------- 22

*Watkins v. Delahunty*, 117 N.Y.S. 885, 888 (App. Div. 1909) ---------------------------------------- 12

*Wittels v. Sanford,* 137 A.D.3d 657, 658 (1st Dep't 2016)-------------------------------------------- 17

*Yador v. Mowatt,* No. 19-CV-4128(EK)(RML), 2021 WL 4502442, at *4 (E.D.N.Y. Sept. 30, 2021) --------------------------------------------------------------------------------------------------------- 17

*Zeising v. Kelly*, 152 F.Supp.2d 335, 347 (S.D.N.Y.2001)------------------------------------------- 9

## STATUTES

Fed. R. Civ. P. 56(a) ------------------------------------------------------------------------------------------- 8

## PRELIMINARY STATEMENT

This dispute arises from an oral partnership agreement between Plaintiff Dr. Raymond Basri ("Plaintiff" or "Dr. Basri") and Defendant Richard Gordon ("Gordon") which they agreed to form in June 2015. They agreed to jointly develop a superior respiratory mask and share equally the profits and responsibilities of the venture. Their initial agreement was to split all expenses and profits on a fifty-fifty basis as partners in the venture. Over the course of several years, Dr. Basri contributed his medical expertise, financial resources, and labor to the development of the mask, including overseeing critical fit tests and securing necessary materials. Gordon valued Dr. Basri's medical expertise as he deemed it necessary to give the venture and respiratory mask credibility. In exchange, Gordon acknowledged Dr. Basri sharing equally in the venture.

Defendants now seek summary judgment on the basis that the oral partnership was either never formed in the first place or that it was supplanted by the "Intent to Form a Company" ("IFC Agreement") Agreement and the formation of Air99 LLC ("Air99") in 2016. The IFC Agreement and the formation of Air99 were merely steps toward formalizing their mutual goal of establishing a business structure, not to dissolve their oral partnership.

At a minimum, genuine issues of material fact remain concerning the existence and continuation of the partnership, making summary judgment inappropriate. Accordingly, this Court should deny Defendants' motion and allow the case to proceed to trial, where the factual disputes regarding the partnership, the formation of Air99, and Defendants' actions to exclude Dr. Basri from the venture can be resolved.

## <u>STATEMENT OF FACTS</u>

### a. Formation of the Partnership

Dr. Basri and Gordon have been friends for over four decades, having first met as undergraduate students in the mid-1970s. *See* Basri Decl. ¶ 7. Dr. Basri attended Columbia University with Gordon's brothers, Michael and Andrew, and Gordon was a frequent visitor to the New York campus. *Id.* Dr. Basri has maintained constant contact in the years that followed with the entire Gordon family, including attending family parties, weddings, and holiday celebrations. *Id.,* ¶ 8.  It was at one such celebration, the June 15, 2015, birthday party for Michael Gordon that the partnership was formed. *Id.,* ¶ 10. Defendant had recently returned from living in China with his family. *Id.* He sought out Dr. Basri to discuss his idea of attempting to develop a superior respiratory face mask, primarily to protect children like his son. *Id.,* ¶ 13. Gordon knew that Dr. Basri was an accomplished physician with expertise in pulmonary medicine. *Id.,* ¶¶ 11, 12. He knew Dr. Basri was a volunteer firefighter who worked in the toxic smoke at the site of the World Trade Center on 9/11. *Id.,* ¶ 11; Basri Decl. Ex. 1.

### b. Agreement Between the Parties

The initial oral agreement between Gordon and Dr. Basri was to create a partnership of equals, on a 50/50 basis, for the purpose of developing an innovative respiratory mask design. *See* Basri Decl. ¶ 15. The partners agreed to work together to create a mask, test the design, find a factory to help mass produce the masks, and then engage in the commercial exploitation of the mask. *Id.,* ¶ 13.

While Gordon was motivated by developing a respiratory mask for children, he also expected to profit from a potential billion-dollar market for a successful product. *Id.* Given their decades-long friendship, Dr. Basri never thought it was necessary to formalize his relationship with Gordon in a written document. *Id.,* ¶ 18. At the outset of this new venture, there was no

product, no capital, and no structure. *Id.,* ¶ 15. There was never any discussion of designating Dr. Basri as an "advisor" or "independent contractor" in the nascent venture. *Id*. Gordon never offered to compensate Dr. Basri except through his interest as a partner in the venture. *Id*.

While Gordon initially introduced Dr. Basri to his friend Sandro Klein ("Klein") and subsequently, to his wife Min Xiao ("Xiao"), their contributions during the development of the respiratory mask were minimal. *Id.,* ¶ 21. For the first three years of the Parties' work together there was no need for, or discussion of, an Advisory Board for the venture. *Id.,* ¶ 15. There were no meetings of the alleged Advisory Board until 2018. *Id.*

During the period from 2015 to 2019, Dr. Basri had a full-time medical practice and other medically related responsibilities. *Id.,* ¶ 26. This did not diminish his commitment to the mask partnership and its life-saving potential. *Id.* Dr. Basri worked closely with Gordon. *Id.* He made himself available to Gordon throughout the day and he answered telephone calls and text messages from early morning to late into the night. *Id.* Most of Dr. Basri's weekends were devoted to the partnership. *Id.* For four years, Dr. Barsi spent an average of ten hours each week working with Gordon. *Id.*

While Gordon claimed to have worked on the respiratory mask while living in China, those efforts appeared to be limited to cutting up adult masks in an attempt to fit them on his young son. *Id.,* ¶ 27. When they started working together, Dr. Basri found that Gordon's level of knowledge and sophistication as to respiratory masks was minimal. *Id.,* ¶ 23. He did not know the regulatory standards applicable to respiratory masks or the protocols used to test mask fit and effectiveness. *Id*. Only after Dr. Basri joined Gordon in the partnership did they develop a professional, systematic approach to designing and testing various ideas for masks. *Id.*

3

### c. Development of the Mask

At the outset, Gordon and Dr. Basri considered a wide variety of potential designs. *Id.,* ¶ 38. Generally, protypes were prepared by Gordon and sent to Dr. Basri. Dr. Basri retained an expert in mask testing, Kenneth Eck ("Eck"), to screen the mask designs for their fit. *Id.,* ¶ 31. Dr. Basri and Mr. Eck conducted the tests in Dr. Basri's Middletown, New York medical offices. *Id.* Gordon would attend via videoconferencing and take notes. *See* Eck Decl. ¶ 10. Mr. Eck observed that Gordon has little or no knowledge of facial mask testing procedures, testing equipment, or the regulatory standards applicable to facial masks. *Id.,* ¶ 16.

While conducting the testing the Parties reached the simple conclusion that by increasing the number of folds, the mask would have more filter material. *See* Basri Decl. ¶ 33. The added material would allow for more space between the mask and the face which would make breathing easier and comfortable. *Id.* The change would also increase the efficiency of the mask. *Id.* The Parties discussed how to maximize the number of folds, and this was the critical insight that led to the final design. *Id.*

Gordon offered to experiment with origami-style folds to see if a suitable design might be disclosed. *Id.* ¶ 34. Much later, Gordon claimed origami was a childhood hobby. *Id.* Contrary to Gordon's assertion that he had a Eureka! insight, the final design was a natural evolution of the iterative design process used by the Parties. *Id.* The origami pattern, called the "waterbomb," was believed to show the most promise as a face mask. *Id.*

Once the waterbomb pattern prototype mask was being tested, it was Dr. Basri who sought adjustments for a better fit for adult males and children. *Id.,* ¶ 35. He recommended that the folds be adjusted in later iterations of the prototype. *Id.* He is also responsible for the design

and placement of the ear straps or harness mechanism that holds the mask in place. *Id*. His creative contributions and collaborations qualified him as a co-inventor of the mask. *Id.,* ¶ 36.

### d. Attempt to Formalize the Business

In March 2016 Dr. Basri and Klein were presented with the IFC Agreement document prepared by Gordon. *Id.,* ¶ 43. The principal provisions of the IFC Agreement were an assignment of Dr. Basri's intellectual property rights, a non-disclosure provision, and a non-compete agreement. *Id*.; Defendants' Ex. K. The IFC Agreement named Gordon the Team Leader, which Dr. Basri believed was a meaningless provision since he considered the founders to be equal partners. *Id*. Dr. Basri was never offered and did not receive anything from Gordon to assign his rights pursuant to the IFC Agreement. *See* Basri Decl. ¶ 44; Basri Depo. Tr., Defendants' Ex. E, 187:16-17; Gordon Depo. Tr., Defendants' Ex. A at 70:7-72:19.

All the parties, including Dr. Basri, signed the IFC Agreement, which stated that Gordon was the "Leader" and that all ideas and intellectual property regarding the mask would be assigned to a future company, if any. *See* Defendants' Ex. K. This IFC Agreement was in effect until March 27, 2017. *Id*.

In August 2016, Gordon filed the documents necessary to form Air99 as a Colorado limited liability company. Id., ¶ 45. Initially, Gordon gave himself all the equity. Id. On July 9, 2017, Gordon presented Dr. Basri with a set of documents, including the Air99's Operating Agreement, which allocated all the "Class A" units of 3,120,000 units of equity to himself while offering Dr. Basri 80,000 units of "Class B" non-voting units. Id., ¶ 48; Gordon Depo. Tr., Defendants' Ex. A, at 89:7-18; 95:21-96:11. Since this offer gave Dr. Basri neither a say in the management of Air99 nor a fair share of the equity, Dr. Basri refused to sign the tendered documents. See Basri Decl. ¶¶ 48, 49. He demanded to be treated as an equal by Gordon. Id., ¶

49. Despite Gordon's attempted power grab, Dr. Basri continued to participate as principal in the partnership because he felt strongly about the mission of the venture.  Id., ¶ 48.

### e. Patent for the Mask

After two years of experimentation and effort, the partners agreed that the origami version of the respiratory mask was unique and novel and that they should attempt to have it patented. Id., ¶ 30. Gordon hired a local Colorado law firm but refused to allow the other members of the venture to communicate directly with the patent counsel.  Id., ¶ 50. Nevertheless, Gordon and Dr. Basri were in frequent contact regarding the drafting of the patent and the patent claims. Id., ¶ 51. Dr. Basri reviewed drafts of the patent application and offered substantive and stylistic edits to each draft. Id. Gordon also asked Dr. Basri to pay for some of the patent lawyers' fees. Id., ¶ 50.

In reviewing the draft patent applications, Dr. Basri noted that only Gordon was listed as the inventor. Id., ¶ 53. Dr. Basri knew this was not a true statement since the final respiratory mask invention was the result of a collaborative effort. Id. Dr. Basri fought vigorously to have his name included in the patent application but eventually failed because Gordon had sole contact with the patent counsel. Id.

### f. Investment and Fundraising Efforts

Well before the COVID-19 pandemic, Dr. Basri believed that a superior respiratory mask with a reasonable price would have huge worldwide potential. *See* Basri Decl. ¶ 55. As a prominent physician in New York City, Dr. Basri had a broad set of contacts with wealthy individuals who could become investors in the venture or could provide connections to interested investors. *Id*. Dr. Basri took the lead in finding investors once the design of the mask was nearing completion. *Id.* Before each meeting with these wealthy individuals, Dr. Basri conferred with

Gordon and told him of his plans. *Id., ¶* 40. At each meeting, Dr. Basri presented himself as an equal partner in the venture. *Id., ¶* 41. In contrast, Gordon engaged in secret solicitations which were never revealed to Dr. Basri. *Id., ¶* 40. However, even though Gordon's wife, Xiao, had an MBA degree, no business plan was ever produced to support the solicitation. *Id., ¶* 56. This intentional failure appears to have been a premeditated attempt to stymie Dr. Basri's efforts to raise funds from investors since a business plan was an essential document to present to investors. *Id.*

Gordon's alternative strategy was to try to win government or private grants, which did not require the transfer of equity. Id., ¶ 57. Dr. Basri also pursued this type of funding from Bloomberg Philanthropy. Id., ¶ 59.

### g. The BARDA Competition Award

In the spring of 2019, the federal government's Biomedical Advanced Research and Development Authority ("BARDA") conducted a Mask Innovation Challenge, seeking new designs for respiratory face masks. Id., ¶ 60. This was exactly the kind of recognition the partnership needed to move their invention to production. Id. Both Gordon and Dr. Basri worked diligently in preparing an application in support of their invention. Id. It was the subject of intense effort by both. Id. Having passed an initial screening round, the AIR99 team was invited to make a short oral presentation. Id., ¶ 61. The majority of Gordon's presentation was rambling and unfocused. Id. Dr. Basri was the final speaker on behalf of the invention. Id. He presented a crip conclusion addressing the required criteria for the competition and incorporating the medical use cases for the mask. Id. Gordon praised Dr. Basri's presentation as persuasive, and it was credited as a decisive factor in winning the competition. Id.

BARDA scheduled an award ceremony for the competition winners for October 15, 2019, in Washington, D.C. Id., ¶ 64. After Dr. Basri made reservations to attend the ceremony, Gordon attempted to discourage him from attending. Id., ¶ 66; Basri Ex. 47.  Since the $100,000 award from BARDA was the first funding event, Dr. Basri wanted to finally reach an agreement on his fair equity share. See Basri Decl. ¶ 68. In September and October, the Parties engaged in repeated negotiations as to a fair allocation of equity. Id.; Basri Depo. Tr., Defendants' Ex. E, at 221:21-222:20. Dr. Basri was prepared to sign the corporate documents tendered by Gordon when a final agreement was reached. See Basri Decl. ¶ 68.

### g. Gordon's Unseemly Termination of Dr. Basri

Prior to the award ceremony Gordon "fired" Dr. Basri from the venture.  Nevertheless, Dr. Basri attended the BARDA award ceremony, but Gordon refused to allow him on the stage of the award ceremony. *Id.,* ¶ 69. Despite his humiliation at being shunned by Gordon, Dr. Basri had his photo taken with Gordon to commemorate this key event. *Id.;* Brown Decl. Ex. 101.  On October 20, 2019, Gordon sent Dr. Basri correspondence, backdated to October 4, 2019, documenting the alleged termination of Dr. Basri as an advisor to Air99. *See* Basri Decl. ¶ 70; Basri Ex. 50. The letter included a Separation Agreement offering Dr. Basri $12,000 for his past services, $8000 for other considerations, and an estimated sum for business expenses reimbursed. *See* Basri Decl. ¶ 70; Basri Ex. 41. Dr. Basri considered the offer as an intentional, brazen undervaluing of his four years of participation in the respiratory mask venture. *See* Basri Decl. ¶ 70.

<u>**ARGUMENT**</u>

### I.    Legal Standard

Summary judgment is appropriate only when the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). On a summary judgment motion, the court is prohibited from "weigh[ing] the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). Rather, the court must determine whether a fair-minded jury could reasonably return a verdict for the non-movant based on the evidence. *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

## II.    Dr. Basri and Gordon Mutually Intended to Form a Partnership

A reasonable juror could conclude that the parties entered into an oral partnership agreement. To demonstrate the existence of a partnership, a plaintiff must prove four elements: (1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners. *See North Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*, 99 Civ. 4643, 2000 WL 1290608, *1 (S.D.N.Y Sept. 11, 2000).

Under New York law, a partnership may exist without a written agreement and the intentions of the parties may be inferred circumstantially. *Cohen v. Biernoff*, 444 N.Y.S.2d 152, 153 (2d Dep't 1981). A partnership does not require formal agreements on all terms. *See Prince v. O'Brien,* 234 A.D.2d 12, 12 (1st Dep't 1996) The concepts of "partnership" and "joint venture" are closely intertwined because "the legal consequences of a joint venture are equivalent to those of a partnership." *Itel Containers Int'l Corp. v. Atlanttrafik Express Service, Ltd.*, 909 F.2d 698, 701 (2d Cir.1990) (quoting *Gramercy Equities v. Dumont*, 72 N.Y.2d 560, 565 (1988)); *Zeising v. Kelly*, 152 F.Supp.2d 335, 347 (S.D.N.Y.2001) ("[p]rinciples of partnership law control the analysis of joint venture agreements"); *Scholastic, Inc. v. Harris*, 259 F.3d 73, 84 (2d Cir.2001)

9

("Under New York law joint ventures are governed by the same legal rules as partnerships because a joint venture is essentially a partnership for a limited purpose.").

Dr. Basri and Gordon met at a birthday party in June 2015. At that party, Gordon introduced the concept of a respiratory device for children in China to Dr. Basri. *See* Basri Depo. Tr., Defendants' Ex. E, at 39:19-22. Dr. Basri accepted Gordon's invitation. *Id.*, at 43:20-44:16. Both parties intended to form a venture to develop a respiratory protection mask as a business as equal partners. *Id.*, at 54:20-23. Gordon further said that since he had just moved back from China with no source of income and employment, Dr. Basri would have to provide initial funding for the venture. *Id.*, at 52:20-53:2.

On December 13, 2015, Gordon prepared meeting minutes summarizing the discussion among Gordon, Dr. Basri, and Klein, which stated, "We decided we must take the simplest path if we hope to get a product to market this year," which indicated that a commercial venture was formed among them. *See* Brown Decl. Ex. 102 at 2-3. In response to this email, Dr. Basri added 15 other items relating to the material, design, cost, and potential suppliers of the mask. These were among his initial contributions to the process of invention. *Id.* at 1-2.

Dr. Basri and Gordon took significant steps as partners before and after the formation of Air99 and the signing of the IFC Agreement in March 2016, demonstrating their mutual intent to formalize and continue their business relationship. For instance, (i) Dr. Basri arranged and paid for Eck's testing services to test the mask designs, and Gordon accepted and participated in these services; (ii) Dr. Basri retained expert Konstantine Goranov ("Goranov") on behalf of the partnership in early-2016 and required him to sign a non-disclosure agreement;(iii) Dr. Basri actively sought investors and helped the company enter the BARDA competition, where they

ultimately secured first place; (iv)  Dr. Basri spent months of time working with Gordon on the patent application.

Defendants assert that because the parties "never agreed on the essential terms of any alleged profit-sharing," there was no intent to form an oral partnership. *See* Defs' Mem. p. 16. However, an agreement will not fail for lack of definiteness where it can be rendered certain by reference to extrinsic sources. *See Shann v. Dunk,* 84 F.3d 73, 78 (2d Cir. 1996) (holding that even though essential terms relating to the terms of an employment contract and non-compete agreement were missing, that does not render the contract void when considering the evidence surrounding it.) *See* also, *Scholastic, Inc. v. Harris*, 259 F.3d 73, 84 (2d Cir. 2001) (finding that the parties proffered conflicting testimony and evidence created a genuine issue of material fact, requiring the court to deny summary judgment and allow the jury to determine whether the term "HEI" referred to a partnership, joint venture, or another business structure).

Nonetheless, while Dr. Basri answered a speculative question in his deposition that he had nothing to do with Air99 after October 2019 and would, therefore not be liable for the losses it suffered since he was terminated. If properly presented, Dr. Basri would have explained that he expected a 50% share of profits earned and implicitly would accept the same share of any business losses based upon his agreement in 2015. *See* Basri Decl. ¶ 18; Defendants' Ex. E, at 256:21-257:15. Dr. Basri emphasized that the 50/50 partnership was an agreement from the beginning several times in his deposition. For example, he testified that he was always willing to negotiate and look for something that was fair, "but the basis was a 50-50 equal partnership commencing with the time that we discussed, initially, the need for respiratory protection mask." *Id*. at 185:12-17. He was prepared to accept business expenses and business losses.

Contrary to Defendants' position, the partnership between Basri and Gordon initially had a definite allocation of equity on a 50/50 basis. The parties' decision to not memorialize this agreement does not negate their existence of an oral partnership.

### III.    Dr. Basri and Gordon Mutually Intended to Continue their Partnership

#### A.    The Partnership Was Not Supplanted by the IFC Agreement and the Formation of Air99

The Parties agreed to form a 50/50 partnership. That partnership continued despite the IFC Agreement and the formation of Air99 LLC. *Id*. ¶¶ 13, 15.  Defendants rely on the *Sagamore* decision to argue that the alleged oral partnership ceased to exist after the signing of the IFC Agreement and the formation of Air99 in August 2016. However, the *Sagamore* decision holds that the terms of a joint venture agreement survive the formation of a corporate entity created to implement the joint venture agreement, and such joint venture remains enforceable, where parties clearly intended agreement to survive the formation of the corporation. *Sagamore Corp. v. Diamond W. Energy Corp.*, 806 F.2d 373, 379 (2d Cir. 1986).

Here, like in *Sagamore*, Dr. Basri and Gordon had a mutual understanding that their partnership would continue alongside the corporate entity, Air99. For instance, the specific language in the IFC Agreement demonstrates the existence of a partnership and the parties' mutual understanding that Dr. Basri and Gordon would continue their collaborative efforts and business relationship to develop and exploit the mask in a more formal corporate structure, rather than to completely dissolve or replace their partnership. *See e.g.,* Defendants' Ex. K at 2. ("If I decide not to proceed with the proposed business relationship."). The IFC Agreement confirms the understanding between Dr. Basri and Gordon that they were forming a business, and that Plaintiff was not an "advisor." *Id*. ("Agreement does not obligate Company to disclose any information or negotiate or enter into any agreement or relationship").

12

New York courts have consistently held that the mere incorporation of a company does not automatically dissolve an existing partnership unless the parties expressly agree to such dissolution. *See e.g.*, *Watkins v. Delahunty*, 117 N.Y.S. 885, 888 (2d Dep't 1909) (holding that a co-partnership is not terminated by the organization of the corporation unless by a termination agreement or distribution of the stock and bonds of the corporation according to the respective interests of the parties.). Individuals can function as partners or joint venturers among themselves, even while using a corporate structure to present themselves to third parties. *See Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,* 309 A.D.2d 288, 300 (1st Dep't 2003). The key issue in *Richbell* was whether the parties' internal partnership rights conflicted with the corporation's operation. *Id*. at 299, 300. The Appellate Division found no legal obstacle to parties being partners privately while using a corporation, as long as this arrangement does not interfere with the corporation's functioning. *Id*. at 300.

Here, following the principles of *Richbell*, the IFC Agreement does not conflict with the parties' understanding of their oral partnership because the agreement did not contain any express language that the oral partnership would be dissolved or terminated upon the signing of the IFC Agreement. *Sagamore Corp*. at 379 (stating that "[w]hen determining whether a joint venture ceases to exist when the parties form a corporation to carry out one or more of its objectives, the governing concern is whether the parties' rights as joint venturers are in conflict with the corporation's functioning, rather than whether they expressly provided for a reservation of rights in the corporate governance documents."); *Growblox Scis., Inc. v. GCM Admin. Servs., LLC*, No. 14-CV-2280 ER, 2015 WL 3504208, at *8 (S.D.N.Y. June 2, 2015) (holding "in the absence of any facts that show that the alleged partners retained their rights vis-à-vis one another,

the Court cannot assume that the partnership - to the extent one existed - did not merge into the corporation").

Nor does the formation of Air99 or its operating agreement expressly state that the formation of the LLC was intended to terminate or alter the initial oral partnership between Dr. Basri and Gordon. *See* Brown Decl. Ex. 103. Since neither the IFC Agreement nor the Operating Agreement expressly stated that the parties' oral partnership was terminated, a factfinder could reasonably conclude that the parties' partnership continued. *Zeising*, at 344. In fact, Gordon expressly indicated that was the purpose of incorporating Air99. On March 26, 2016, Gordon sent an email to Dr. Basri, Klein, and Xiao, indicating that the purpose of the incorporation was to "provide us personal liability protection and create an entity that can receive investment and hold IP." *See* Brown Decl. Ex. 104. Nothing relating to the termination of the parties' oral partnership was mentioned herein.[1]

Contrary to Defendants' assertion that the alleged oral partnership ceased to exist after the signing of the IFC Agreement and the formation of Air99 in August 2016, a reasonable jury could find that the termination of the partnership occurred on October 31, 2019, when Gordon sent Basri an email declaring that he was never founder or partner. *See* Basri Ex. 49. *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 172 (S.D.N.Y. 2004) ("a venture at will can be terminated…at any time by any act which evidence intent to terminate the association.").

### B. The Parties' Negotiation Demonstrate a Mutual Understanding of Continuing their Partnership

After Gordon formed Air99, Dr. Basri sent an email, dated March 8, 2016, stating that the next step for the group was to "incorporate and *divide up the entity*." (emphasis added). *See*

---

[1] Also, a fact finder could reasonably determine that this email offers proof that Dr. Basri was never an independent contractor since it is not necessary to "provide personal protection" to an independent contractor.

Brown Decl. Ex. 105. Dr. Basri's statement clearly demonstrated his intention to exercise his rights to negotiate his share of the equity in the venture. A defined equity share is a critical material term to supplant a partnership, but which is lacking here. *See Watkins*, 117 N.Y.S. at 888-889.

The evidence demonstrates the parties' understanding that Dr. Basri had or should have a stake in the company, but it was simply not settled after Air99 was formed. Between February 2016 and October 2019, Dr. Basri proposed receiving various equity percentages of thirty percent and twenty-three percent, and later requested a ten percent share prior to attending the 2019 BARDA Award Ceremony.  *See* Basri Ex. 32, 33, 34[2], 35, 36, 48, and 49. However, Gordon was merely willing to offer Dr. Basri 40,000 shares at $0.01 per share, equivalent to 2% in the company for "his past contributions and expected future activities." *See* Basri Ex. 35. Dr. Basri declined the equity percentage, but not the equity itself, because he felt "completely undervalued" by Gordon's offer, which he found "insulting." *See* Basri Decl. ¶ 68.

 Dr. Basri's objections to Gordon's equity offers and the parties' continued negotiations of the equity percentages demonstrate their mutual belief in Dr. Basri's significant contributions to their efforts to develop the respiratory mask. The actions are consistent with partners in a venture. Thus, a question of fact exists. *See Kaur v. Royal Arcadia Palace, Inc.*, 643 F. Supp. 2d 276, 296 (E.D.N.Y. 2007) (holding that there is a question of fact for a jury to decide if a partnership was formed based on the statements of the parties, the nature of a party's contribution, and whether a party provided a combination of property, skills, and knowledge to the venture.)

---

[2] Gordon assigned 23% to Dr. Basri in this "founder's pie" exercise (Basri Ex. 34) while Dr. Basri assigned 30% to himself (Basri Ex. 33) in February 2016.

### C. Gordon Recognized Dr. Basri's Contributions Consistent With A Partnership

Despite not becoming a formal member of Air99, Dr. Basri personally financed the fit-testing services conducted by Eck, which were critical to the development of the mask. These payments occurred after the formation of Air99, demonstrating that Dr. Basri was still involved as a partner.

Dr. Basri held himself out as a representative of Air99 in communications with experts in the field of respiratory masks and played a significant role as a partner by taking charge of critical aspects of the mask's development, such as determining whether the prototypes met the necessary safety and fit standards. For instance, Dr. Basri's recruitment of Eck, oversight of the mask testing process, and reporting his results about the tests, show Dr. Basri's hands-on role in developing the technical aspects of the mask. *See* Eck Decl. ¶¶ 8-12.

The decision-making authority vested in Dr. Basri to engage a leading respiratory expert like Eck for professional fit tests is consistent with the responsibilities of a partner in product development. Eck was involved over the course of three years, with no evidence of Gordon objecting to his retention. Nor is there any evidence that Gordon rejected Dr. Basri's retention of Goranov's professional services, and his signing of the NDA presented by Dr. Basri. *See* Basri Ex. 27 and 28; Gordon Depo. Tr., Defendants' Ex. A, at 56:17-57:7. The foregoing irrefutable facts also underscore Dr. Basri's active role in the venture which extended far beyond mere advisory duties, by ensuring the mask met professional and industry standards. *See Kaur*, 643 at 296.

To further illustrate Gordon's understanding that the oral partnership continued after Air99 was formed when Klein expressed reluctance in 2016 about giving Dr. Basri a seat on Air99's Board, Gordon told Klein and Xiao that Dr. Basri was essential due to his credentials.

16

Gordon noted, "Dr. Ray signed on a year ago and has injected a positive energy into the system that helped push us along. I think that needs to be recognized when we proceed with the first Air99 equity round." *See* Brown Decl. Ex. 106. Finally, a year after the formation of Air99, Gordon sent an email to Dr. Basri on April 25, 2017, stating "Air99 needs a doctor on its Advisory Board (AB). You bring unique qualities to this task. Therefore, please consider the following offer of compensation for past contributions and expected future activities." *See* Basri Ex. 35. Gordon's actions reflect his belief that the oral partnership with Dr. Basri was ongoing.

Notably, Gordon never informed Dr. Basri that he was not a partner or direct contributor to the mask's development. It was just before the 2019 BARDA Award Ceremony that Gordon, for the first time, asserted that Basri was never a partner in the venture and referred to Basri as merely an "independent contractor." *See* Basri Ex. 49, 50, 51. *See Kaur*, 643 F. Supp. 2d at 296.

In sum, this continued involvement demonstrates that Dr. Basri operated with the expectation of a continuing partnership-like relationship.

### IV.   Dr. Basri Is Entitled to An Equitable Share Even If The Partnership Was Terminated

A former partner is entitled to relief in the form of an accounting and his distributive share of the partnership's asset upon the partnership's termination. *See Yador v. Mowatt,* No. 19-CV-4128(EK)(RML), 2021 WL 4502442, at *4 (E.D.N.Y. Sept. 30, 2021) (holding that the question of whether and when the partnership ended requires discovery to resolve, but the partners are entitled to receive in cash from the partnership even though the partnership was dissolved or a partner was expelled.); *Wittels v. Sanford,* 137 A.D.3d 657, 658 (1st Dep't 2016) (partners are entitled to their "distributive share" of the partnership interest at dissolution); *Dwyer v. Nicholson*, 193 A.D.2d 70, 72-73 (2d Dep't 1993) (partnership's pending "contingency

fee cases and similar intangible firm assets" were subject to distribution at dissolution, absent agreement to the contrary).

**V.      Summary Judgment Must Be Denied Because Defendants' Actions to Exclude Dr. Basri Create Genuine Issues of Material Fact**

Gordon's attempt to allocate a mere 2% equity share to Dr. Basri is a direct breach of their oral partnership agreement. The IFC Agreement, the formation of Air99, and the parties' actions were not so "unequivocal" to effect the termination of the partnership at any specific time. *Yador*, 2021 WL 4502442, at \*4 (finding "it is not apparent from the pleadings that Defendant's actions were so "unequivocal" that they had the effect of terminating the partnership."); *Sagus Marine Corp. v. Donald G. Rynne & Co.*, 207 A.D.2d 701, 702 (1st Dep't 1994) (summary judgment is improper because there was an issue of fact as to when a joint venture was dissolved). *Scholastic, Inc. v. Harris*, 259 F.3d 73, 87 (2d Cir. 2001) ("[i]f—and when—the joint venture was dissolved is a prototypical fact question that a jury must determine.").

At the very least, issues of credibility, intent, and the nature of the relationship between Dr. Basri and Gordon raise genuine disputes of material fact, making summary judgment inappropriate. *McClellan v. Smith*, 439 F.3d 137 (2d Cir. 2006); *Missan v. Schoenfeld*, 95 A.D.2d 198 (1st Dept. 1983)

**VI.      Gordon Is Estopped from Denying the Existence of a Partnership**

A partnership by estoppel can be established by showing that (i) there is "a representation that the partnership exists" and (ii) "that the injured party relied on this representation to his or her detriment." *In re Fairfield Sentry Ltd.*, 627 B.R. 546, 564 (Bankr. S.D.N.Y. 2021).

Defendants' arguments regarding Plaintiff's promissory estoppel claim are based on their allegations that "Plaintiff's oral partnership claim is deficient." Def. Memo. p. 20. However, as

18

set forth above, a triable issue of fact regarding the existence of the oral partnership exists. *Sagus Marine Corp.*, at 702.

Dr. Basri contributed, among other things, four years of his time and effort, business travel, research, communication, and legal expenses in reliance on Gordon's representation. *See* Basri Depo. Tr., Defendants' Ex. E, at 163-164. Gordon did not object to Dr. Basri's describing himself as "the second principal of the new venture" and his introduction as "a partner with Dr. Basri" He is liable for Dr. Basri's reliance on the existence of the partnership.

Defendants rely on the false assumption that the IFC Agreement automatically terminated the previous partnership. Defendants ignore the fact that there was no provision in the IFC Agreement indicating the termination of the partnership. In *Fairfield*, the Court held that the reliance of the injured party on a similar representation is well-established when a complaint is "read as one cohesive document, the allegations are pled with sufficient detail." *See In re Fairfield Sentry Ltd.*, 627 B.R. at 564. Here, Dr. Basri adequately established his reliance on the oral partnership or the representation of a partnership.

Defendants also argue that Plaintiff failed to establish any damages amounting to an unconscionable injury. Def. Memo p.20. Dr. Basri contributed over four years of time, research, communication, and funding partnership expenses based on his reliance on the partnership or the representation of the partnership. Thus, Plaintiff made it clear in the Amended Complaint that "[i]t would be inequitable and unjust for Gordon to retain Basri's valuable contributions without giving Basri the promised participation in the Venture and fair compensation for his time and payment of expenses," Amended Compl. ¶ 86. These valuable contributions are much more than "expectation damages" alleged by Defendants.

**VII.    Dr. Basri Has Adequately Plead the Allegations of Fraud**

In a motion for summary judgment movant bears the initial burden that shows the absence of a genuine issue of material fact. If the movant meets this initial burden, then the opposing party should demonstrate that there exists a genuine dispute as to the material facts. *See In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey*, 194 B.R. 728, 731 (S.D.N.Y. 1995). If the opposing party presents a reasonable conflicting interpretation of a material disputed fact, then the summary judgment must be denied. *See Id.*

Here, it is worth noting that Defendants failed to fulfill their initial burden to prove the "absence of a genuine issue of material fact" as to Plaintiff's fraud claim. Instead, Defendants focused on Plaintiff's alleged failure to establish its fraud claim by arguing that fraud is not distinguished it from a breach of the partnership agreement. S*ee* Def. Memo. pp. 21-23.

A plaintiff alleging fraud must show by clear and convincing evidence that the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007).

Here, even though Dr. Basri does not have the duty to raise a genuine issue of fact without Defendants making their initial burden, there are triable issues of material fact in this fraud claim. For example, on February 7, 2016, Gordon sent an email to Dr. Basri, Klein, and Xiao with the subject "Carving up the '*founder's'* pie." (emphasis added) *See* Basri Ex. 31 at 2-3. In this email, Gordon asked Dr. Basri, Klein, and Xiao to "go through [the] private exercise of filling out the *founders* table both for one's self as well as for the other *members*,…I'm hoping this will provide you with a thoughtful perspective on how the pie might be carved up fairly,…[u]ltimately, we need to reach an agreement that we all feel is fair and equitable *to all parties involved.*" (emphasis added). *Id.* Gordon said in this email that his plan was to

"anonymously consolidate these data in a spreadsheet so [everyone] can get an average picture of where everyone stands." *Id*. These statements obviously indicated that Dr. Basri was one of the founders and members of the venture and they were trying to find a fair way to distribute their equity in the venture.[3] Dr. Basri reasonably relied on the statements and did the exercise, assigning Gordon and Xiao 49.9% because he was concerned about giving them more than 50%. *See Id*. at 1-2 and Basri Ex. 33.

Later on, March 26, 2016, Gordon sent an email to Dr. Basri, Klein, and Xiao, indicating that the purpose of the incorporation was to "provide us personal liability protection and create an entity that can receive investment and hold IP." *See* Brown Decl. Ex. 104. Two days later, on March 28, 2016, Gordon sent the Intention to Form A Company document to the same recipients, Dr. Basri, Klein, and Xiao, and referred to them as "Team Members." *See* Defendants' Ex. K. Dr. Basri reasonably believed he was a partner in the venture. He signed the IFC Agreement to assign all of his intellectual property rights to the venture. *See* Compl. ¶ 92.

Nevertheless, Gordon never released the result of the "founder's pie exercise," in which he promised to let every founder/member know where everyone stands. *See* Basri Ex. 32 at 2-3. Dr. Basri reasonably believed that the equity negotiations were ongoing. Suddenly on February 27, 2017, Gordon claimed himself as the sole inventor of the mask in the patent application, fully taking advantage of Dr. Basri's contribution to the mask invention.

Contrary to Defendants' arguments, this fraudulent conduct is not merely based on a breach of the oral partnership agreement, nor is it based on misrepresentation of a future intent to perform. This series of fraudulent conduct demonstrates Gordon's sophisticated arrangements of (i) knowingly or recklessly misrepresenting Dr. Basri as a founder or member of the venture; (ii)

---

[3] Notably, Gordon assigned 23% to Dr. Basri in this *founder's* pie exercise.  See Basri Ex. 34 at 3. An independent contractor would not be involved in a "founder's pie" exercise.

intending to persuade Dr. Basri to sign the IFC Agreement and assign all of his IP rights, know-how, and contributions to the venture by implying that he would be a founder/member of the venture; (iii) designating himself as a sole inventor of the mask invention and misappropriating Dr. Basri's contributions, resulting in damages to Dr. Basri. *See Merrill Lynch & Co. Inc.*, at 181. Plaintiff's fraud claim is supported by all the foregoing elements. It is the jury's duty to assess the credibility of conflicting versions of events, which the Court cannot do in a motion for summary judgment. *See Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999).

### VIII. Summary Judgment Must Be Denied as to the Claims For Unjust Enrichment and Quantum Meruit

Plaintiff's primary claim is for breach of the oral agreement to form a general partnership. Plaintiff worked diligently alongside Gordon for four years to develop the respiratory mask, secure a patent for the mask, and then commercialize the mask. Defendants have denied the existence of the general partnership. Defendants assert that Plaintiff's role in the venture was merely that of an "advisor." In his Amended Complaint, Plaintiff, a recognized medical specialist, and respiratory medicine expert, has sought, in the alternative, compensation for the four years of work he devoted to the venture.

Plaintiff's contract claim does not prohibit him from pursuing, in the alternative, claims for unjust enrichment and quantum meruit when the parties dispute whether there is an enforceable contract. *Phillips v. Reed Group, Ltd.,* 955 F. Supp. 2d 201, 242–243 (S.D.N.Y. 2013). *See* also, *Labajo v. Best Buy Stores, L.P.,* 478 F.Supp.2d 523, 531 (S.D.N.Y. 2007) ("[w]hen there is a bona fide dispute as to the existence of a contract ... [,] assertion of a breach of contract claim does not preclude [plaintiff] from pleading an unjust enrichment claim in the alternative").

Plaintiff has an enforceable unjust enrichment claim because there is abundant proof that (1) "the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'" *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011).

The Court may analyze quantum meruit and unjust enrichment demands together as a single quasi-contract claim. *See Newman & Schwartz v. Asplundh Tree Expert Co., Inc.,* 102 F.3d 660, 663 (2d Cir.1996) (citing *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 768 F. Supp. 89, 96 (S.D.N.Y.1991) (explaining that "quantum meruit and unjust enrichment are not separate causes of action," and that "unjust enrichment is a required element for …quantum meruit, meaning 'as much as he deserves…'"), *rev'd on other grounds,* 959 F.2d 425 (2d Cir.1992).

In this case, Plaintiff can easily establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 69 (2d Cir. 2000). Dr. Basri entered into his partnership with Defendant because he expected to receive profits from the sale of the respiratory mask the Parties were developing. Gordon cut off the possibility of sharing in these profits by terminating Dr. Basri in October 2019. *See* Basri Ex. 49, 50, 51.

Nevertheless, Plaintiff has a right to reasonable and fair compensation for the four years of services he rendered. "The question of whether a party had a reasonable expectation of compensation for services rendered is a matter for the trier of fact to determine based on the evidence before it." *Moors v. Hall*, 532 N.Y.S.2d 412, 414 (1988).

A clear indication that Plaintiff rendered valuable services to Defendants is the offer extended to him after his "termination" in October 2019. In order to secure a General Release,

Defendants offered $12,000 as payment for Plaintiff's four years of service and $8000 as other compensation. *See* Basri Ex. 41. Plaintiff strongly disagrees as to the valuation of his work since he is routinely paid $500 to $850 per hour for his professional services. However, the existence of the offer of payment is clear and convincing proof that if Plaintiff was not a partner with Gordon, he must be reasonably compensated. Plaintiff has asserted that he is entitled to compensation of $1,050,000. *See* Basri Decl. ¶69. The amount of compensation due on the quantum meruit claim is a matter for the jury to decide. *See Hilton Wiener LLC v. Zenk*, 211 N.Y.S.3d 36, 37 (1st Dep't 2024) (holding that "claims seeking recovery under the 'quasi-contractual theory of quantum meruit' for 'only money damages' are considered 'actions at law' entitling parties to a trial by jury.")

## IX.    Breach of Fiduciary Duty and Accounting

Plaintiff and Gordon formed a general partnership in October 2015 and then worked together continuously for four years. When Gordon designated himself the "leader" of the partnership, he also assumed a fiduciary duty to act for the benefit of the partnership and its members. A fiduciary relationship arises "when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of relation." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) (quotation omitted).

A court should not determine whether a fiduciary relationship was formed "by recourse to rigid formulas, [as] New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F. Supp. 1220, 1231 (S.D.N.Y. 1991), *rev'd on other grounds*, 967 F.2d 742 (2d Cir. 1992). Setting aside how Gordon describes the role of Plaintiff, the record shows that Gordon demanded control of the partnership, often as an attempt to deflect the influence of Dr. Basri.

24

Where the breach of fiduciary duty is found, these cases loosen the normally stringent requirements of causation and damages. A plaintiff alleging breach of fiduciary duty, however, is not required to meet the higher standard of loss or proximate causation. *ABKCO Music, Inc. v. Harrisongs Music, Ltd*., 722 F.2d 988, 995 (2d Cir. 1983); *Northwestern Nat. Ins. Co. v. Alberts*, 769 F. Supp. 498, 506 (S.D.N.Y. 1991). Given the less stringent requirements of proof arising from a breach of fiduciary duty claim, a jury may find a plaintiff suffered a monetary injury. *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537 (2d Cir. 1994). Plaintiff suffered significant damages, which must be determined by a jury.

An additional remedy sought by Plaintiff is an accounting by Defendants of the finances of Air99. Gordon mismanaged the resources of Air99 to the extent that it failed to profit from the extraordinary demand for respiratory masks during the COVID-19 pandemic. An audit of the books and records of Air99 may reveal how such a blunder was made possible. Plaintiff has the right to demand such an accounting because he has shown that the partnership created a fiduciary relationship. "Common law provides for the right to an equitable accounting where a fiduciary relationship or some other special circumstance exists." *Palazzo v. Palazzo*, 503 N.Y.S.2d 381 (2d Dep't. 1986). An equitable accounting is a right that was available to a member of an LLC against a managing member. *Gottlieb v. Northriver Trading Co. LLC*, 872 N.Y.S.2d 46 (1st Dep't 2009); *Evans v. Perl,* 2009 N.Y. Misc. LEXIS 5920 (2009).

An audit of Air99 LLC's books and records is an appropriate remedy under the current set of facts.

## CONCLUSION

For all the foregoing reasons, Defendants' instant motion for Summary Judgement should be denied, and this dispute should proceed to trial.

Dated: New York, New York
        October 3, 2024

Respectfully submitted,

**PETER BROWN & ASSOCIATES LLP**

_____/s/Peter Brown_____

Peter Brown
pbrown@browntechlegal.com
260 Madison Avenue, 16th Floor
New York, New York 10016
Telephone: 212.939.6440
Facsimile:   646.607.2530
_Attorneys for Plaintiff_

**LEE & LUM, LLP**

_____/s/Robert Lum_____

Robert Lum
rlum@leelumlaw.com
1185 Avenue of the Americas, 3rd Floor
New York, New York 10036
Telephone: 212.634.7248
Facsimile:  212.634.7246
_Attorneys for Plaintiff_