UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RAYMOND BASRI,

                              Plaintiff,

            -against-

RICHARD GORDON, et al.,

                              Defendants.

23-CV-1170 (JGLC)

**OPINION AND ORDER**

---

JESSICA G. L. CLARKE, United States District Judge:

This case concerns an alleged oral partnership agreement between Plaintiff Raymond Basri ("Plaintiff" or "Basri") and Defendant Richard Gordon ("Gordon") regarding the development of a modified N-95 mask, which eventually came to be called the Airgami mask. Basri is a physician in internal medicine, and Gordon is an inventor. Basri and Gordon have known each other since the early 1970s. Both Basri and Gordon attended a birthday party in June 2015. Basri claims that at this party, Gordon sought him out and proposed that they form an equal partnership to create and market a mask. Gordon, however, denies having any such conversation, and the parties never reduced this alleged agreement to writing.

Beginning in 2016, Basri and Gordon, along with Gordon's wife, Dr. Min Xiao, and close friend, Sandro Klein, met periodically to discuss the ongoing development of the mask. Whereas Gordon viewed Plaintiff as serving only in an advisor and consultant role, Plaintiff believed he was working in a joint venture with Gordon. In March 2016, the parties executed an agreement stating their intent to form a company, and Gordon subsequently formed Air99 LLC. At various points, the group also discussed potential equity allocations. Each time Plaintiff proposed an equity allocation, he always gave Gordon a higher percentage than he gave himself. Plaintiff claims he periodically attempted to negotiate an allocation with Gordon.

Eventually, the Airgami mask came to life, and was patented by Air99, with Gordon (over Basri's objection) named as the sole inventor. The Airgami mask enjoyed some success, with Air99 selling thousands of masks and winning awards. Before one of these award ceremonies in Washington D.C., Plaintiff asked that Gordon agree to give him 10% equity. Gordon did not agree, and because of the disagreement, instructed Plaintiff not to appear at the ceremony as a representative of Air99. Plaintiff did so anyway, and Gordon terminated him from Air99 shortly thereafter. Gordon sent a Separation Agreement for Plaintiff to sign, which included a severance payment and reimbursement for covered expenses. Plaintiff did not sign the agreement. Ultimately, Air99 failed to become profitable, and it ceased operations in 2023.

Plaintiff then filed this action, claiming Gordon breached their oral partnership agreement, committed fraud, unjustly enriched himself, and breached his obligations as a fiduciary. Defendants now move for summary judgment. Because the undisputed facts demonstrate there was no oral partnership agreement (and consequently, no fiduciary duties that Gordon owed to Plaintiff), no fraudulent misstatement or omission, and no promises reasonably relied upon by Plaintiff, these claims must fail. Plaintiff's quasi-contract claim (unjust enrichment and quantum meruit), however, survives summary judgment because genuine issues of fact remain regarding Plaintiff's expectations of compensation and whether he received the reasonable value of his services and contributions to the mask project. Accordingly, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are, unless otherwise noted, taken from the parties' Rule 56.1 Statements, declarations, and accompanying exhibits. The Court only cites a 56.1 statement where (1) the parties have agreed the factual assertion is undisputed; and (2) the factual assertion is properly supported by a citation to the record. This includes instances where a party does not

truly "dispute" an assertion, but merely seeks to qualify or add their own "spin" to it. *See Kaye v. New York City Health and Hosps. Corp.*, No. 18-CV-12137 (JPC), 2023 WL 2745556, at *2 n.2 (S.D.N.Y. Mar. 31, 2023). In addition, the Court may consider admissible statements contained in a declaration so long as the statements are made with personal knowledge. *See Walker v. Carrozzo*, 664 F.Supp.3d 490, 504 (S.D.N.Y. 2023) ("Where a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.") (cleaned up) (citing *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012)).

## I.    Factual Background

Defendant Air99 LLC is a limited liability company formed on August 9, 2016, under the laws of the State of Colorado, with Defendant Richard Gordon as the sole member. ECF No. 55-2 ("Joint SMF") ¶ 1.

Defendant Richard Gordon graduated from Brown University with a Bachelor of Science degree and from Stanford University with a Master's degree in electrical engineering. ECF No. 59 ("Def. 56.1") ¶ 1; ECF No. 57 ¶ 2. His professional history includes research and technical positions, developing a start-up, and inventing and designing products. Def. 56.1 ¶ 1. Plaintiff Raymond Basri is a Board-certified physician in internal medicine with expertise in pulmonary medicine. ECF No. 67[1] ¶ 85. Basri has also served as a volunteer firefighter since 1987 and was a volunteer on 9/11 at the World Trade Center. ECF No. 64 ¶ 4.

Gordon lived in China from 2011 to 2014 with his family. ECF No. 67 ¶ 2. According to Gordon, because of the smog in China, he worked to make prototype N-95 masks that could fit

---

[1] Plaintiff's Counter 56.1 statement of facts begins on page 21 of this filing.

his son. ECF No. 57 ¶ 5. Gordon claims he spent over 3000 hours developing a respiratory mask when he was in China between 2011 and 2014. *Id.* ¶ 6. Gordon's work on the mask involved building prototypes and making sketches generated by a parametric module generator (which is a custom computer program). *Id.* ¶¶ 7, 32.

Gordon moved back to the United States in 2014. *Id.* ¶ 8. Gordon continued to work on developing the modified N-95 mask, and reached out to Sandro Klein, an industrial designer and close friend, to assist him. *Id.* ¶ 9. Gordon, Klein, and Gordon's wife, Dr. Min Xiao, also continued to work on development. *Id.* ¶¶ 3(e), 9.

### A. Gordon's History with Basri & the June 2015 "Oral Partnership" Conversation

Gordon met Basri in 1973 while visiting his brother, Michael Gordon, at college. Def. 56.1 ¶¶ 7, 8. Gordon claims he only saw Basri two or three times at parties between 1973 and June 2015, and that during those meetings, he never had substantive discussions with him. Plaintiff recalls meeting with Gordon more frequently during that time period at Gordon family events. *Id.* ¶ 8.

In June 2015, Basri and Gordon met at a birthday party in Newport Beach, California. *Id.* ¶ 10. Basri and Gordon discussed Gordon's mask while standing outside drinking cocktails. *Id.* ¶ 11. Basri claims Gordon sought him out, told him about his idea of developing a respiratory mask, and stated that he wanted to take advantage of Plaintiff's knowledge and experience. *Id.* ¶¶ 12, 13. Gordon claims he did not ask Basri to be involved and knew little about his qualifications at that time. ECF No. 57 ¶ 17. Basri claims he wanted to work on the mask because of his personal experience as a volunteer firefighter and medical professional. ECF No. 64 ¶ 13.

Basri testified that during this conversation, Gordon suggested they form a joint partnership to develop the mask. ECF No. 58-5 at 43:17–44:16; 47:11–22. Basri originally

testified he did not recall Gordon using the term "equal partner," *id.* 46:18–47:3, but he then testified shortly thereafter that he believed Gordon did actually use that term. *Id.* at 48:8–20. According to this alleged agreement, Basri was to be entitled to no less than 50% of the alleged partnership. Def. 56.1 ¶ 13. Basri testified that during that conversation, he and Gordon did not discuss how losses would be shared. ECF No. 58-5 at 53:16–17. Basri also later testified that he would not be liable for Air99's losses because the company's failure was not his fault. Def. 56.1 ¶ 16; ECF No. 58-5 at 256:21–157:15.

Gordon denies any conversation discussing partnership occurred in June 2015. ECF No. 57 ¶¶ 17–20. Gordon further claims he never discussed a partnership between him and Basri, of any type, *at all* between June 2015 and 2019. *Id.* ¶ 19. Basri and Gordon never entered into a *written* partnership agreement, and there is no writing that exists that documents the terms of any alleged partnership agreement. Joint SMF ¶ 9. Basri claims they did not reduce the agreement to writing because of their "long-term friendship." Def. 56.1 ¶ 13.

On June 22, 2015, Basri emailed Gordon stating he would like to work on the mask. ECF No. 58-2. Gordon responded that things would be hectic in the near term because he was moving his family to Boulder, Colorado, but suggested that he, Basri, Sandro Klein, and Dr. Xiao have a "kickoff Skype discussion" in three weeks. *Id.* Gordon also noted he and Klein had been "kicking around some physical design ideas for a while." *Id.* Basri responded the following day he would start looking for suitable materials, and he was "delighted" with the team Gordon was assembling. *Id.*

### B. The Advisory Board & Parties' Contributions to Development

Gordon worked on the mask in a full-time capacity beginning in 2015. ECF No. 57 ¶ 36. Basri never worked full time on the mask project, and instead retained his medical practice. *Id.*; Def. 56.1 ¶ 28.

5

Gordon claims that he told Basri, Xiao, and Klein they would be advisors (and would jointly constitute the Advisory Board). ECF No. 57 ¶ 23. Basri denies this ever occurred, ECF No. 64 ¶ 15, and claims the project at that stage was merely a "venture with no product, no capital, and no structure." ECF No. 64 ¶ 15. Beginning in 2016, Gordon claims the Advisory Board met on a quarterly basis to get updates on the mask development, and that he prepared board meeting decks. ECF No. 57 ¶¶ 22, 23. Gordon claims that during one such Advisory Board meeting in March 2016, Basri had a disagreement with Gordon and threatened to leave the group and pursue a mask himself. Def. 56.1 ¶ 40. Specifically, Basri wanted the group to continue with a gasket mask incorporating SomaFoama, whereas the rest of the group wanted to focus on researching and developing an origami mask and scarf mask. ECF No. 57 ¶ 43; ECF No. 58-5 at 177:3–178:24. Basri subsequently apologized to the group on March 8, 2016, stating that he would not "go out and do [the mask] on [his] own." Def. 56.1 ¶ 41. In that same email, Basri stated the "next step" for the group was to "incorporate and divide up the entity." *Id.* ¶ 42.

In April 2016, Gordon claims he developed the first original prototype of what would become the "Airgami" mask. ECF No. 57 ¶ 28. Gordon claims he had a "eureka" moment for the Airgami mask while working on another one of his inventions. *Id.* ¶ 30. Gordon asserts that Basri had no role in inventing the Airgami mask and that Basri lacked the expertise to invent or design an origami mask. *Id.* ¶ 37. Basri claims there actually was no "eureka" moment and that the design of the Airgami mask actually resulted from joint trials and experiments conducted by himself and Gordon. ECF No. 64 ¶ 34.

The Airgami mask featured a set of origami creases that, when folded, form a dome shaped body that seals tightly around the wearer's face. Def. 56.1 ¶ 24. The mask also included a set of origami folds that integrate with this dome shaped body to form a pocket out of the filter to seal tightly around the wearer's nose without any nose wire or clip. *Id.* Between August 2016 and

February 2017, Gordon claims he spent "hundreds" of hours on the patent process. ECF No. 57 ¶ 46. Basri claims that Gordon frequently consulted with him on the patent application and that he offered substantive edits to it. ECF No. 64 ¶ 51. Gordon also hired a patent lawyer with offices in Boulder, Colorado, and Basri claims he reviewed drafts and made substantive additions to the patent. *Id.* ¶ 52. Basri also paid a portion of the patent counsel's legal fees. *Id.* ¶ 50. The Airgami mask resulted in a patent being issued on October 13, 2020, with Air99 LLC listed as the entity filing the application and Gordon named as the sole inventor. ECF No. 57-13. Basri claims he also fought with Gordon to have himself also listed as an inventor on the patent, but failed because Gordon had "sole contact" with patent counsel. ECF No. 64 ¶ 53.

Basri never shared any sketches or designs of masks with the group. Def. 56.1 ¶ 30. Basri also did not build any prototypes: only Klein and Gordon developed and built prototypes. *Id.* ¶ 31. Basri claims his role was not to build or construct the various iterations of masks, but instead to professionally test them to assess their effectiveness. ECF No. 64 ¶ 30. Gordon, however, claims he solicited designs and prototypes on multiple occasions from the group (including Basri). ECF No. 75 ¶ 9.

Basri engaged Ken Eck, a prominent respiratory testing expert and firefighter, to conduct tests of the Airgami mask prototypes that Gordon and Klein developed. Def. 56.1 ¶ 35; ECF No. 64 ¶ 31. Basri served as the test subject, and after eight fit test sessions, generated four written reports. Def. 56.1 ¶¶ 36, 37. According to Gordon, Basri did not follow proper testing procedures, and Gordon therefore had to conduct his own fit testing and generate his own reports for the remaining four sessions. ECF No. 57 ¶¶ 57, 58. Eck, however, claims the tests followed all procedures, that Gordon had little to no knowledge about relevant testing protocols, and that Gordon relied on him and Basri to provide that information. ECF No. 65 ¶¶ 15–17. Over the course of the four years, Basri claims he contributed an average of 10 hours per week to the

7

project. ECF No. 64 ¶ 26. However, Basri did not log or keep track of his hours despite Gordon

asking him to do so. Def. 56.1 ¶ 29. Basri also claims he made himself available to Gordon

throughout the day and answered calls and text messages from early morning to late night. ECF

No. 64 ¶ 26.

### C. Discussions of Equity Allocation & Corporate Formation

On February 7, 2016, Gordon sent Klein, Basri, and Xiao a link to an article written by

Frank Demmler, entitled "Cutting up the Founder's Pie," and requested that they participate in an

exercise where each of them would confidentially propose a respective division of equity in the

project among them. Joint SMF ¶ 10. Gordon wrote "we need to reach an agreement that we all

feel is fair and equitable." ECF No. 58-12 at AIR000448. Gordon also suggested the group

consider whether to allocate an employee equity pool at the outset, or, in the alternative, "divide

up 100% of the pie up front and then all founders subsequently should expect that their share will

be diluted . . . ." *Id.*

Pursuant to this exercise, Basri proposed to the others a division of equity, as follows:

30% to Basri; 32.6% to Gordon; 20% to Klein; and 17.3% to Xiao. Joint SMF ¶ 11. Basri, in

giving his distribution, also stated he believed "[Gordon] would be the best and most available

CEO" and noted any allocation "giving [Gordon] and [Xiao] more than 50% equity would be a

problem." ECF No. 58-12 at AIR000446. Ultimately, no agreement was reached among Gordon,

Basri, Klein, and Xiao on a respective division of equity. Joint SMF ¶ 12. Around the same time,

on February 15, 2016, Gordon emailed Basri, Klein, and Xiao to note potential corporate

formations, such as an "LLC," "C-corp," and "S-corp." ECF No. 57-11 at AIR 001414. Basri

suggested the group incorporate and formalize the mask project, writing "we should go for an

LLC or even a PC professional corporation . . . ." *Id.*; Def. 56.1 ¶ 50.

On March 26, 2016, Gordon sent a document entitled "Intention to Form A Company" (the "IFC Agreement") to Basri. Joint SMF ¶ 3; ECF No. 58-11. In an email from the same day, Gordon wrote the following (ECF No. 66-4):

> The purpose of incorporation is to provide us personal liability protection and create an entity that can receive investment and hold IP. It is my opinion that we haven't reached that stage, yet, though it feels close.
>
> The attorney suggested that I draft an Intention To Form A Company (ITFAC) agreement and have everyone sign. The wording should be clear that it is a contract.
>
> Therefore, I am in the process of preparing an ITFAC document that will obligate each of us to assign IP to the future Air99 and non disclose and non compete.

Gordon signed the IFC Agreement on March 26, 2016, and Basri signed the document on or about March 27, 2016. Joint SMF ¶¶ 3, 4. The IFC Agreement designated Gordon, Basri, Xiao, and Klein as "Team Members," and designated Gordon as the "Team Leader." *Id.* ¶ 5. The IFC Agreement evinced an intention by the "Team Members" to form a "Company," and that it would be in effect until March 27, 2017. *Id.* ¶¶ 6, 7.

The IFC Agreement provided that the Company "shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, sui generis database rights and all other intellectual property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, molds, designs, know-how, business practices, ideas and information made or conceived or reduced to practice, in electronic or physical form, in whole or in part by [the signer] prior to the incorporation of Company." Joint SMF ¶ 8. Basri claims he did not object to designating Gordon as the "Team Leader" because he still believed they were equal partners and collaborators, and wanted to "maintain a harmonious working relationship." ECF No. 64 ¶ 43.

In April of 2017, Gordon again asked the group to propose equity divisions in Air99. Joint SMF ¶ 13. Basri proposed the following division: 23% to himself, 33% to Gordon, 23% to

Klein, and 21% to Xiao. *Id.* ¶ 14. On April 26, 2017, Gordon eventually made the following equity allocation: 75% to Gordon; 18% to the shares pool (for any future additional employees); 2.5% to Klein; 2.0% to Basri; 1.5% to Xiao; and 1.0% to another third-party (referred to in the parties' 56.1 as "Lang"). Def. 56.1 ¶ 58. Gordon then sent all team members, including Basri, an Advisory Board Agreement, Operating Agreement, and Subscription Agreement which memorialized the offers to each member. *Id.* ¶ 60. The agreements identified Gordon as the CEO of Air99. Def. 56.1 ¶ 74. Xiao, Klein, and Lang all signed the agreements and made capital contributions for their shares. *Id.* ¶ 61. Basri, however, did not execute the agreements and complained to Gordon about the allocation. ECF No. 64 ¶¶ 48, 49. Basri thought the allocation "undervalued him" and found it insulting. Def. 56.1 ¶ 62. However, Basri ultimately decided to defer further discussion of his equity position until a later time. ECF No. 64 ¶ 49.

On July 3, 2017, Basri wrote "I'd like my stake to be aligned with you." ECF No. 58-18. However, Basri only requested a 10% equity share in Air99 in that same email. *Id.* Basri testified that even if Gordon had agreed to the 10% proposal, Basri "absolutely" would not have accepted it. Def. 56.1 ¶ 64.

### D.  Capital Contributions & Fundings

Gordon made an initial capital contribution into Air99 of $31,200 for his shares in the company. *Id.* ¶ 66. Gordon also contributed a total of $475,000, with accrued unpaid interest of approximately $33,000, since Air99 was formed. *Id.* ¶ 67; ECF No. 57 ¶ 60. Gordon also claims he incurred approximately $36,000 in expenses for Air99's business. *Id.* ¶ 61. Basri never contributed capital to Air99 for shares because he wanted to negotiate an allocation different than the one Gordon decided on. Def. 56.1 ¶ 68; ECF No. 64 ¶ 49. Basri did, however, pay approximately $25,000 to Air99 for operating expenses. Def. 56.1 ¶ 70; ECF No. 58-20. Gordon

sent Basri a check for this amount, which Basri received but never cashed. Def. 56.1 ¶ 71. This

amount is Basri's only claimed financial contribution to Air99. *Id.* ¶ 70.

With respect to external funding, Gordon only allowed the display of samples of the mask

to potential investors who signed NDAs. ECF No. 75 ¶ 17. Basri claims he met with "wealthy

individuals" from his personal network for potential funding, and in those meetings, identified

himself as an equal partner in a venture with Gordon. ECF No. 64 ¶¶ 40, 41. Basri claims

Gordon never objected to that identification until 2019. *Id.* ¶ 41.

Basri claims that Gordon needed to develop a business plan to secure venture funding and

failed to do so. *Id.* ¶ 56. Gordon disputes this, claiming he and Xiao worked on a business plan

and developed executive summaries sufficient to document the status of the Airgami mask to

apply for grants. ECF No. 75 ¶ 16. Basri testified he never attempted to solicit any funding from

any potential investors in Air99. Def. 56.1 ¶ 72.

### E.  Airgami's Market Performance and Basri's Separation

The Airgami mask enjoyed some success. For instance, the mask won several

competitions, including the JLABS Quickfire Challenge and the Part I and 2022 Part II BARDA

Mask Innovation Challenge, yielding $260,000. Def. 56.1. ¶ 76. JLABS had an award ceremony

on October 15 and 16, 2019 in Washington D.C. Def. 56.1. ¶ 77. Gordon claims he worked many

hours to complete requested new designs and prototypes during the month leading up to the

ceremony. ECF No. 57 ¶ 64. About two weeks before the ceremony, Basri requested a "minimum

of 10% equity agreed to" before he and Gordon went to the ceremony. ECF No. 58-21 at

BAS1702. Basri claimed he "expected to be treated as a partner" which meant "receiving 30 to

50% interest in Air99." ECF No. 64 ¶ 68. Gordon responded by asking how much money Basri

was willing to put in, and Basri merely responded "I've earned 10%." ECF No. 58-21 at

BAS1702. Basri claims this was another attempt at negotiating with Gordon. ECF No. 58-5 at

221:16–222:13. On October 14, 2019, Gordon asked that Basri not attend the representative of Air99, and stated it was "his instruction as CEO of Air99." ECF No. 58-21 at BAS1699. Basri disregarded Gordon's instruction as "invalid" and attended the ceremony. Def. 56.1 ¶ 81.

On October 20, 2019, Gordon sent Basri an email that he was terminated from Air99. ECF No. 58-23. Shortly thereafter, on October 30, 2019, Gordon sent a Separation Agreement and Letter of Termination to Basri. Def. 56.1 ¶ 83. The Separation Agreement contemplated a severance payment of approximately $45,000, which included $12,000 in "compensation for services" and $25,037.20 as a reimbursement for Basri's incurred expenses. ECF No. 58-24 at AIR000377. The Separation Agreement also stated that Basri "provided advisory services to the Company from time to time as an independent contractor" and that the "Advisory Relationship" ended. *Id.* Basri did not accept or sign the agreement. Def. 56.1 ¶ 83. Plaintiff maintains he did not understand himself to be an advisor or consultant, and that had he been an advisor, he would have "charged" his "usual rates as a professional." ECF No. 64. ¶ 69.

Despite the awards Airgami earned, and despite selling tens of thousands of masks to customers, the venture had not been profitable since its inception and had suffered significant net losses. ECF No. 57 ¶ 66. Gordon was not able to develop an automatic process by which the Airgami mask could be manufactured in an efficient and cost-effective manner. *Id.* Airgami ceased operations in late 2023. *Id.* ¶ 67. Gordon claims he continues to work on designing an automated manufacturing process for Airgami. *Id.*

## II.    Procedural History

Plaintiff filed this action on February 10, 2023 alleging claims of fraud, promissory estoppel, breach of fiduciary duty, breach of general partnership, and quasi-contract (quantum meruit and unjust enrichment), and seeking equitable relief in the form of an accounting, as well as compensatory damages and attorneys' fees and costs. ECF No. 1 ("Compl."). Plaintiff filed an

Amended Complaint on May 17, 2023, which asserted the same causes of action. ECF No. 22 ("Am. Compl."). Defendants filed an answer to the Amended Complaint on June 6, 2023, ECF No. 28, denying virtually all allegations and raising various affirmative defenses. On August 19, 2024, Defendants filed the instant motion for summary judgment as to all Plaintiff's claims. ECF Nos. 55, 56 ("Mem.").

## LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 22. If the movant meets its initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted).

When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137

(2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)). "The function of the district court in considering [a] motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) (internal quotation marks and citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (internal citation omitted).

## DISCUSSION

This discussion proceeds in four sections. First, the Court determines that the breach of oral partnership claim does not survive summary judgment because Plaintiff and Gordon never discussed sharing losses, and because the subsequent formation of Air99 would have supplanted any oral agreement. Second, the Court dismisses the promissory estoppel claim because, based on the undisputed evidence, Plaintiff could not have reasonably relied on any promise that Gordon made in June 2015. Third, the Court determines the quasi-contract claims (quantum meruit and unjust enrichment) can proceed because Plaintiff has created a dispute of fact as to whether he reasonably expected compensation for his contributions, and a dispute as to the reasonable value of his services to Air99 and the mask project. Finally, the Court dismisses Plaintiff's remaining claims for breach of fiduciary duty and an accounting because it has already concluded that no partnership was formed by oral agreement, which is a predicate to the success of those claims. The Court also dismisses the fraud claim either as duplicative of the breach of oral partnership claim, or for failing to raise a genuine dispute as to any material misrepresentation.

I.    **Plaintiff's Claim for Breach of an Oral Partnership Does Not Survive Summary Judgment**

Defendant Gordon argues he never formed an oral partnership with Plaintiff at the June 2015 birthday party because, among other things, they did not discuss loss allocation, and there was no intent. Mem. at 14–19. In addition, Defendants argue that even if an oral partnership had been formed, it ceased to exist upon the formation of Air99 LLC. Mem at 12–14. The Court must first determine if an oral partnership existed before considering whether the IFC Agreement and subsequent formation of Air99 supplanted it. As set forth below, because Plaintiff has not furnished any evidence that he and Gordon agreed to share losses, a finder of fact could not conclude an oral partnership had been formed.

**A.  No Oral Partnership was Formed in June 2015**

Based on the record, no reasonable jury could find that Gordon and Plaintiff formed an oral partnership at the birthday party in June 2015.

An oral agreement is sufficient to create a joint venture relationship. *See Blank v. Nadler*, 143 A.D. 2d 966, 966 (2d Dep't 1988). "In deciding whether a partnership exists, the factors to be considered are the intent of [the individuals] (express or implied), whether there was joint control and management of the business, whether there was a sharing of the profits as well as a sharing of the losses, and whether there was a combination of property, skill or knowledge. No one factor is determinative [and] it is necessary to examine the relationship as a whole." *Bianchi v. Midtown Reporting Service*, 103 A.D. 3d 1261, 1262–62 (4th Dept. 2013) (cleaned up). However, "some of the[] [factors] weigh more heavily than others." *Toretto v. Donnelly Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 587 (S.D.N.Y. 2022). "An indispensable essential of a contract of partnership or joint venture, both under common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of

making good the losses." *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003); *see also Slinin v. Shnaider*, No. 15-CV-9674 (RJS), 2019 WL 13214733, at *7 (S.D.N.Y. Oct. 1, 2019) (same).

Here, Plaintiff claims that Gordon approached him, told him about his idea of developing a respiratory mask, and stated that he wanted to take advantage of Plaintiff's unique knowledge and experience. ECF No. 64 ¶ 12, 13. Plaintiff also testified their agreement contemplated they would be equal partners. Def. 56.1 ¶ 13. Construing this in the light most favorable to Plaintiff as the non-movant, these facts could lead a jury to find a combination of skill and knowledge and express intention.

However, it is undisputed that Plaintiff and Gordon did not discuss sharing losses during the June 2015 conversation or at any point during their work together between 2015 and 2019. ECF No. 58-5 at 53:16–17. "[T]he overwhelming weight of authority demonstrates that the absence of any agreement to share the burden of losses is fatal to a partnership claim." *Oppedisano v. Zur*, No. 20-CV-5395 (VB), 2024 WL 967260, at *7 (S.D.N.Y. Mar. 5, 2024) (cleaned up) (collecting cases). "Further, '[i]f there was no agreement as to the *manner* in which the parties were to share in the profits and the losses, the agreement did not create a joint venture.'" *Jobanputra v. Kim*, No. 21-CV-7071 (ER), 2024 WL 2055061, at *6 (S.D.N.Y. May 8, 2024) (quoting *Zeising v. Kelly*, 152 F. Supp. 2d 335, 348–49 (S.D.N.Y. 2001)). Indeed, Plaintiff later claimed that he would not be liable for Air99's losses because, in his view, he was not responsible for its failure, a view that is plainly inconsistent with an alleged partnership agreement. ECF No. 58-5 at 256:21–257:15.

Plaintiff and Gordon's conduct after the June 2015 conversation similarly do not suggest they formed, or intended to form, an equal partnership. The record is devoid of any evidence indicating that Plaintiff or Gordon agreed to, or actually did, share losses (or even profits). At

most, Plaintiff has provided evidence he paid for some of Air99's expenses. But even if Plaintiff

and Gordon had agreed to share expenses, this evidence would not suffice, because merely

agreeing to share expenses is insufficient to show an agreement to share losses. *See Fisher v.*

*Tice*, 692 F. App'x 54, 57 (2d Cir. 2017) (summary order). The record also does not reflect any

agreement between Plaintiff and Gordon to share profits equally, and it is undisputed that

Plaintiff never made any capital contributions for shares in Air99 LLC. Def. 56.1 ¶ 68. And the

Court rejects any suggestion that Plaintiff's efforts in assisting to create the alleged partnership

itself constitutes evidence of sharing a "loss." *See ARTCO, Inc. v. Kiddie, Inc*., No. 88-CV-5734

(MJL), 1993 WL 962596, at *10 (S.D.N.Y. Dec. 28, 1993) (noting that if "simply expending

efforts to set up a venture were sufficient to satisfy the essential element of sharing of losses, the

requirement could nearly always be satisfied"); *accord Jobanputra*, 2024 WL 2055061, at *6.

    Nor is there a genuine dispute as to the joint control or management factor. Whereas

Gordon worked on the project full time, developed prototypes, and was the sole team leader

listed in the IFC Agreement, *see supra* Background §§ I(B) & (C), Plaintiff claims he contributed

10 hours a week on average, opting instead to prioritize his medical practice. *See supra,*

Background § I(B). The IFC Agreement designated Gordon as the sole team leader and CEO of

Air99, and by Plaintiff's own admission, he constantly "negotiated" or "requested" certain equity

allocations, further evincing an understanding that Gordon was exclusively (or at least primarily)

in charge of the mask project. *Id.,* § I(C).

    Accordingly, summary judgment is appropriate on this claim. *Oppedisano*, 2024 WL

967260, at *7 (granting summary judgment on oral partnership claim because there was no

evidence the parties agreed to share losses); *Moses v. Savedoff*, 947 N.Y.S.2d 419, 423 (1st Dep't

2012) (finding no oral partnership agreement because, among other things, plaintiff did not agree

to share losses and made no capital contributions).

**B.  The Formation of Air99 LLC, and Plaintiff and Gordon's Subsequent Conduct, Would Have Supplanted or Dissolved any Oral Partnership**

Even if a reasonable jury could find that Plaintiff and Gordon formed a partnership, the subsequent execution of the IFC Agreement and formation of Air99 LLC would have supplanted it. "[A]n oral agreement to form a partnership or joint venture for an indefinite period creates a partnership or joint venture at will." *Foster v. Kovner*, 840 N.Y.S.2d 328, 331 (1st Dep't 2007). Under New York law, an at-will joint venture may be dissolved "when either party manifests an unequivocal election to cease the collaboration." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 87 (2d Cir. 2001) (cleaned up). Such a dissolution can occur by conduct as well as words. *Id.* (citation omitted). Here, any oral partnership was dissolved by Plaintiff and Gordon's intent to form, and subsequent formation of, Air99 LLC.

It is well settled in New York that a partnership or a joint venture may not operate through a corporate form, and that any fiduciary obligations that "partners" owe one other cease to exist once they agree to conduct business as a corporation. *See Weisman v. Awnair Corp. of America*, 3 N.Y.2d 444, 448–49 (1957). This is because "[a] partnership and a corporation are mutually exclusive, each governed by a separate body of law." *Notar-Francesco v. Furci*, 539 N.Y.S.2d 800, 801 (2d Dep't 1989). However, *Weisman*'s holding has been qualified "so as not to preclude members of a preexisting joint venture from 'acting as partners between themselves and as a corporation to the rest of the world.'" *Lombard & Co. v. De La Roche*, 848 N.Y.S.2d 92, 93 (1st Dep't 2007) (internal citation omitted). "[C]ourts have sanctioned such an arrangement as long as the rights of third parties, like creditors, are not involved and the parties' rights under the partnership agreement are not in conflict with the corporation's functioning." *Blank v. Blank*, 634 N.Y.S.2d 886, 888 (3d Dep't 1995).

Plaintiff argues there is no conflict because the IFC Agreement and the Air99 LLC operating agreement did not expressly reference or terminate the partnership. ECF No. 63 ("Opp.") at 13–14. But as the above case law makes clear, the subsequent conduct and agreement need not *expressly* conflict. Here, there remains no genuine dispute that Gordon and Plaintiff's rights under the supposed equal partnership agreement conflict with the IFC Agreement, Air99's formation, and its functioning. Whereas Plaintiff testified they were to be "equal partners," the IFC Agreement contemplated Gordon as the sole Team Leader, Joint SMF ¶ 5, and Gordon was the CEO of Air99. Def. 56.1 ¶ 74.

The record evidence indicates that both Gordon and Plaintiff also evinced an intent to proceed as a corporation, not a partnership. For instance, on February 15, 2016, Gordon emailed Plaintiff, Klein, and Xiao to note potential corporate formations, such as an LLC, C-corp, and S-corp. ECF No. 57-11 at AIR 001414. Plaintiff himself suggested the group incorporate and formalize the mask project, writing "we should go for an LLC or even a PC professional corporation . . . ." *Id.*; 56.1 ¶ 50. And after Air99 was formed, when Gordon asked the group to propose equity distributions, Plaintiff proposed an *unequal* distribution as between himself and Gordon: 23% to himself, 33% to Gordon, 23% to Klein, and 21% to Xiao. Joint SMF ¶ 14. Moreover, the alleged oral partnership would conflict with Air99 by affecting third parties: namely, Klein and Miao.

Accordingly, because the record would not permit a factfinder to find that an oral partnership was formed, and because any such partnership would have been dissolved by Plaintiff's and Gordon's subsequent conduct, Plaintiff's claim for breach of an oral partnership does not survive summary judgment.

## II.    Plaintiff's Claim for Promissory Estoppel Does Not Survive Summary Judgment

Defendants seek summary judgment on Plaintiff's promissory estoppel claim[2] arguing it is duplicative of the breach of partnership claim, and that Plaintiff has failed to furnished evidence of an "unconscionable injury." Mem. at 19–20. Plaintiff disagrees, arguing he was injured by contributing four years of his time and effort, which required incurring certain expenses. Opp.at 19. Plaintiff's claim does not survive summary judgment because there is no dispute of fact regarding reasonable reliance.

As an initial matter, Defendants argue that Plaintiff's promissory estoppel claim must be dismissed as duplicative of the alleged breach of an oral partnership claim. The Court disagrees.

To be sure, Plaintiff's promissory estoppel claim fundamentally involves the same allegations and assertions as the breach of oral partnership claim: namely, that Gordon did not honor an alleged oral agreement to be equal partners. *Compare* Am. Compl. ¶¶ 82–84 *with* Am. Compl. ¶¶ 95, 96. Courts in this Circuit have observed that a claim for promissory estoppel is duplicative of a claim for breach of contract "unless the plaintiff alleges that the defendant had a duty independent from any arising out of [a] contract." *Hallett v. Stuart Dean Co.*, 481 F. Supp. 3d 294, 307 (S.D.N.Y. 2020) (internal citation omitted). But where, as here, Defendants "dispute the existence of a valid, enforceable contract," Plaintiff "[is] permitted to proceed on both contractual and quasi-contractual theories." *Hallett*, 481 F. Supp. 3d at 307 (quoting *Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, No. 08-CV-10578 (RJS), 2010 WL 1257326, at *9 (S.D.N.Y. Mar. 12, 2010); *see also Rapay v. Chernov,* No.16-CV-4910 (DLC), 2017 WL 892372, at *5 (S.D.N.Y. Mar. 6, 2017). The promissory estoppel claim is therefore not duplicative.

---

[2] Plaintiff appears to raise a claim for "partnership by estoppel" for the first time in his opposition. Opp. at 18. This is improper, as a party may not raise new claims not contained in a complaint through motion papers. *See, e.g., Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The Court will thus not address this belated addition.

"A cause of action for promissory estoppel under New York law requires that plaintiff prove three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on the promise; and (3) actual injury suffered as a result of her reliance." *Kaye v. Grossman*, 202 F.3d 611, 615 (2d. Cir. 2000); *accord Security Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 816 (2d Cir. 2014). In addition, contrary to the parties' briefing, Plaintiff need not show an "unconscionable injury." Mem. at 20; Opp. at 19. That requirement only applies where a plaintiff seeks to invoke promissory estoppel to evade the statute of frauds. *See Philo Smith & Co., Inc. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir. 1977) (holding promissory estoppel is properly reserved for cases involving unconscionable injury because otherwise, the public policy underlying the statute of frauds would be heavily undermined); *accord Bent v. St. John's Univ, N.Y.*, 138 N.Y.S.3d 199, 203 (2d Dep't 2020). But "the New York Statute of Frauds does not apply to oral joint venture agreements." *Hanson v. Hanson*, No. 18-CV-695 (KPF), 2019 WL 935127, at *7 (S.D.N.Y. Feb. 26, 2019) (internal citation omitted). Therefore, a showing of unconscionable injury is not required here.

Considering the elements, genuine issues of fact certainly remain regarding whether Gordon made a clear and unambiguous promise that he and Plaintiff would be equal partners. Only a trier of fact can assess the credibility of Plaintiff's and Gordon's respective recollection of the June 2015 conversation and if a clear promise was made.

However, a reasonable jury could not find that Plaintiff reasonably relied on any alleged promise made by Gordon to be equal partners. The parties executed an IFC Agreement, which identified Gordon as the sole team leader, without any reference to Plaintiff holding an equal position. Joint SMF ¶ 5. While Plaintiff claims he did not object to Gordon being Team Leader because he still believed himself to be an equal partner with Gordon, Plaintiff has not pointed to anything in the record suggesting he consistently cited, or even referenced, the June 2015 alleged

"agreement" to Gordon over the course of their work together. In addition, Once Air99 LLC was formed, it listed Gordon as the sole member, without any role for Plaintiff. Joint SMF ¶ 1.

Indeed, Plaintiff's own conduct suggests he did not actually rely on this alleged promise: he consistently proposed equity allocations that were unequal as between him and Gordon, and in 2019 (before his separation from the Company) he sought only 10% equity in Air99 as compared to Gordon's 75%. *See supra*, Background § I(C). Moreover, Plaintiff claims he "argued with [Gordon]" to get himself added as an inventor to the Airgami mask patent, but Gordon "stubbornly resisted." ECF No. 64. ¶ 53. And Gordon's equity allocation in April of 2017—two years before Plaintiff's separation—giving Plaintiff 2.0% equity in contrast to his 75% should have made clear to Plaintiff Gordon was not operating based on the terms of this alleged promise. Def. 56.1 ¶ 58. Plaintiff continuing to rely on an alleged promise to be equal partners—which would involve, among other things, joint control and management—is implausible on the available record.

Accordingly, because Plaintiff's reliance on an any alleged promise for equal partnership was not reasonable, Plaintiff's promissory estoppel claim does not survive summary judgment. *See Sec. Plans, Inc. v. CUNA Mut. Ins. Soc*., 769 F.3d 807, 816 (2d Cir. 2014) ("As a general matter, a party may not maintain a promissory estoppel claim where the promises on which the claim is based are expressly contradicted by a later written agreement covering the same subject matter.") (internal citation and quotation marks omitted).

### III.    Plaintiff's Quasi-Contract Claim (Unjust Enrichment and Quantum Meruit) Survives Summary Judgment

Defendants seek summary judgment on the quasi-contract claim arguing (1) Plaintiff's claimed contributions of time and effort are indefinite because Plaintiff never tracked his hours; and (2) Gordon sent Plaintiff a reimbursement check to cover the expenses he incurred and

reflecting the value of Plaintiff's contributions. Mem. at 23–24. Plaintiff argues he is entitled to more than the amount Gordon offered with the check, and that the offer itself makes clear Gordon accepted Plaintiff's services. Opp. at 22–24.

Plaintiff's claim for unjust enrichment and quantum meruit will be analyzed together because they are not truly distinct claims. Under New York law, quantum meruit and unjust enrichment are not separate causes of action. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). Instead, unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit is one measure of liability for the breach of such a contract. *Id.* As such, courts in this Circuit regularly "analyze quantum meruit and unjust enrichment together as a single quasi contract claim." *Mintz Fraade L. Firm, P.C. v. Brady*, No. 19-CV-10236 (JMF), 2022 WL 1125957, at *4 (S.D.N.Y. Apr. 15, 2022) (internal citation omitted) (collecting cases). The Court takes the same approach here.

In order to recover in quantum meruit, plaintiff must prove "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Soumayah v. Minnelli*, 839 N.Y.S.2d 79, 81 (1st Dep't 2007); *accord Moses v. Savedoff*, 947 N.Y.S.2d 419, 424 (1st Dep't 2012). Here, genuine issues of fact certainly remain with respect to the first, second, and fourth elements of a quantum meruit recovery. Plaintiff has provided evidence regarding his contribution to the mask project, and a trier of fact could find he offered those services in good faith. A reasonable jury could also find Gordon and Air99 accepted those services because, among other things, Plaintiff has adduced evidence that Gordon spoke to him frequently, that he assisted with the patent application, and that he helped test the Airgami mask (and wrote reports). *See supra*, Background § I(B). A reasonable jury could also

find Plaintiff did not receive a "reasonable value" for the services he offered, and so it is appropriate to submit that question to a factfinder.

However, the record is less clear as to the third element. "Regarding the third element, the plaintiff's expectation of compensation must be reasonable under the circumstances." *Roelcke v. Zip Aviation, LLC*, 571 F. Supp. 3d 214, 231 (S.D.N.Y. 2021). A quantum meruit claim may not be used to recover the value of services rendered if, because of the relationship between the parties, it would be natural to assume such services would be rendered without compensation. *See Killian v. Captain Spicer's Gallery, LLC*, 96 N.Y.S.3d 433 (4th Dep't 2019).

Plaintiff has not provided, or pointed to, any evidence that he expected to be paid for his contributions to the mask project beyond an equity allocation. Indeed, in his declaration, Plaintiff admits he did not understand himself to be an advisor or consultant, and that had he been an advisor, he would have "charged" his "usual rates as a professional." ECF No. 64. ¶ 69. And it is undisputed Plaintiff did not log or track the hours he worked, Def. 56.1 ¶ 29, which is also inconsistent with an expectation to be paid at a certain or fixed rate. It is therefore clear that Plaintiff did not expect compensation in the form of fees for his contributions to the project. *See Napoli v. 243 Glen Cove Ave. Grimaldi, Inc.*, 397 F. Supp. 3d 249, 273 (E.D.N.Y. 2019) (finding, after trial on the issue, no expectation of compensation for time and money plaintiff invested in restaurant because it was instead the result of the joint venture plaintiff had formed).

However, this evidence suggests that Plaintiff expected *some* form of compensation for his work—namely, an equity allocation in the business. Gordon has essentially conceded there remains an issue regarding the value of Plaintiff's services. The Separation Agreement Gordon sent to Basri contemplated a severance payment of approximately $45,000, which included $12,000 in "compensation for services." ECF No. 58-24 at AIR000377. The Court, at this juncture, cannot determine whether this amount was adequate. Accordingly, an issue of fact

remains as to whether Plaintiff received a "reasonable value" for his contributions. *See, e.g., Farina v. Bastianich*, 984 N.Y.S. 2d 46, 49 (1st Dep't 2014) (citing *Caribbean Direct, Inc. v. Dubset LLC*, 954 N.Y.S.2d 66, 67 (1st Dep't 2012)) (noting that the question of whether a party had a reasonable expectation of compensation for services rendered is a matter for the trier of fact to determine based on the evidence before it).

These same facts also demonstrate that issues of fact exist with respect to unjust enrichment. There are sufficient facts from which a reasonable jury could conclude that: (1) Gordon and Air99 were enriched; (2) at Basri's expense; and (3) that it is against equity and good conscience to permit Defendants to retain what Basri contributed. *See Old Republic Nat'l Title Ins. Co. v. Luft*, 859 N.Y.S. 2d 261, 262 (2d Dep't 2008) (internal citations omitted). Summary judgment is therefore not appropriate.

Accordingly, because Plaintiff has provided sufficient evidence to create a dispute of fact as to his expectation of compensation and the reasonable value of his services, the quasi-contract claim survives summary judgment.

## IV. Plaintiff's Remaining Claims for Fraud, Breach of Fiduciary Duty, and an Accounting Do Not Survive Summary Judgment

The Court may summarily grant summary judgment to Defendants on Plaintiff's remaining claims for fraud, breach of fiduciary duty, and accounting because (1) the fraud claim is either duplicative of the first claim for breach of an oral partnership, or otherwise does not raise any genuine issues of fact; and (2) the other claims presuppose a fiduciary relationship which does not exist here because the Court has concluded no oral partnership was formed.

### A. No Evidence of a Fiduciary Duty to Support Accounting or Breach Claims

With respect to the breach of fiduciary duty and accounting claims, Plaintiff argues Gordon owed him a fiduciary duty by virtue of their general partnership and because Gordon

"designated himself as the leader" of their venture. Opp. at 24. However, because the Court has

concluded no general partnership was formed in June 2015, and because Plaintiff articulates no

other basis by which Gordon owed any fiduciary duties, the accounting and breach of fiduciary

duty claims do not survive summary judgment. "The right to an accounting is premised upon the

existence of a fiduciary relationship . . . [and] [s]ince no fiduciary relationship is alleged, the

accounting claim[] cannot stand." *Castellotti v. Free*, 27 N.Y.S.3d 507, 518 (1st Dep't 2016)

(cleaned up); *accord Casanas v. Carlei* 108 N.Y.S.3d 344, 345 (1st Dep't 2019) (affirming

dismissal of accounting where party failed to show fiduciary relationship). Similarly, without a

fiduciary duty, there can be no breach. *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 208

(2d Cir. 2018) (dismissing breach of fiduciary duty claim where no fiduciary relationship

shown).

### B. The Fraud Claim is Duplicative and Does Not Present any Genuine Issues of Material Fact

To the extent Plaintiff's fraud claim relates to the June 2015 alleged agreement, it is

duplicative. A fraud claim is duplicative of a claim for breach of contract "when the only fraud

alleged is that a defendant was not sincere when it promised to perform under the contract"

*Manas v. VMS Assoc. LLC*, 863 N.Y.S.2d 4, 7 (1st Dep't 2008) (internal citation omitted). "It has

long been the rule that parties may not assert fraud claims seeking damages that are duplicative

of those recoverable on a cause of action for breach of contract." *MBIA Ins. Corp. v. Credit

Suisse Sec. (USA) LLC*, 84 N.Y.S.3d 157, 161 (1st Dep't 2018).

Here, Plaintiff discusses Gordon's February 2016 email asking the team to propose equity

allocation, arguing that Gordon's use of the term "founder" implies he understood Plaintiff was a

founder. Opp. at 20–21. Putting aside the fact that "founder" is not synonymous with "equal

partner," Plaintiff's argument makes clear the alleged tortious conduct—and damages sought—

are entirely duplicative of his breach of oral partnership claim: namely, that Gordon did not

honor the alleged June 2015 oral agreement. *Manas,* 863 N.Y.S.2d at 7 (dismissing fraud claim

as duplicative).

Plaintiff also purportedly argues a separate ground for fraud: that Gordon fraudulently

induced Plaintiff into signing away his intellectual property rights. Opp. at 21. Specifically,

Plaintiff points to Gordon's March 2016 email stating that the purpose of any incorporation was

to "provide [them] personal liability protection and create an entity that can receive investment

and hold IP." ECF No. 66-4. According to Plaintiff, this statement, in conjunction with Gordon

using the term "founder" in the equity allocation exercise email (ECF No. 58-12) gave him the

impression he was a partner in the venture and equity negotiations were ongoing. Plaintiff also

seems to suggest that the Airgami mask patent fraudulently identified Gordon as the sole

inventor. Opp. at 21.

The gravamen of these assertions appears to mostly relate to Plaintiff's general assertion

that Gordon did not honor the June 2015 oral agreement and is generally duplicative. But the

Court will nonetheless analyze them. Under New York law, to state a claim for fraud, a plaintiff

must assert: (1) a material misrepresentation or omission of fact; (2) made by defendant with

knowledge of its falsity; (3) intent to defraud; (4) reasonable reliance on the part of the plaintiff;

and (5) resulting damage to the plaintiff. *Skyline Risk Management, Inc. v. Legakis*, 733 F. Supp.

3d 316, 329–30 (S.D.N.Y. 2024) (citing *Structured Cap. Sols., LLC v. Commerzbank AG*, 177 F.

Supp. 3d 816, 836 (S.D.N.Y. 2016)). "A plaintiff may bring a fraud claim based on an omission

rather than an affirmative misrepresentation only 'if the non-disclosing party has a duty to

disclose.'" *Harris v. Pfizer Inc.*, 586 F. Supp. 3d 231, 241 (S.D.N.Y. 2022) (quoting *Remington

Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995)). In addition,

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).

There is no genuine issue to submit to a jury because Plaintiff has not furnished evidence of any alleged misstatement or omission by Gordon. Gordon accurately, and truthfully, conveyed the consequences of signing the IFC Agreement, and the IFC Agreement similarly made clear that the signatories would forfeit certain rights. ECF No. 58-12 at AIR000447–48; ECF No. 58-11 at AIR000201–02. Gordon also truthfully referred to Plaintiff, along with Klein and Xiao, as "founders," which by itself did not make any assertions about equity allocation. Indeed, that was why Plaintiff suggested the allocation exercise. *Id.* And Plaintiff has not identified any duty to disclose that would permit him to assert fraud based on an omission of fact. *See Harris*, 586 F. Supp. 3d at 241.

Moreover, while Plaintiff claims Gordon suddenly, and unilaterally, declared himself the sole inventor of the mask in the patent, Opp. at 21, Plaintiff presents no evidence or argument of how this statement induced, or was intended to induce, any reliance, or how any reliance would have been reasonable, given he would have known its falsity at the time it was made. And in fact, Gordon has presented undisputed evidence only he and Klein *designed* and *constructed* masks, whereas Plaintiff only *tested* masks. *See supra,* Background § 1(B). In short, Plaintiff's fraud claim fails to identify any specific misstatements or omissions by Gordon.

Accordingly, Plaintiff's fraud claim does not survive summary judgment, as it is either duplicative or does not present a genuine issue of fact to submit to a jury.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. In addition, by **April 15, 2025**, the parties shall file a joint letter with proposed trial dates for October, November, or December, and the letter shall indicate whether

the parties are interested in a referral to the Mediation Program or for a settlement conference.

The Clerk of Court is respectfully directed to terminate ECF No. 55.

Dated: March 28, 2025
          New York, New York

                                        SO ORDERED.

                                        _Jessica Clarke_

                                        JESSICA G. L. CLARKE
                                        United States District Judge